[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 05-14765

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCTOBER 12, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 04-00970-CV-WSD-1

ROBERT GARFIELD, individually
and on behalf of all others similarly situated,
THE DEKALB COUNTY PENSION PLAN,

                                        Plaintiffs-Appellants,

                    versus

NDC HEALTH CORPORATION,
WALTER M. HOFF,
RANDOLPH L.M. HUTTO,
CHARLES W. MILLER,
DAVID H. SHENK,
JAMES W. FITZGIBBONS,
LEE ADREAN,
ERNST & YOUNG, LLP,

                                        Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(October 12, 2006)**

Before EDMONDSON, Chief Judge, BIRCH and ALARCÓN,[*] Circuit Judges.

ALARCÓN, Circuit Judge:

Lead Plaintiff DeKalb County Pension Fund ("DeKalb") appeals from the District Court's Order dismissing its Second Amended Complaint for failure to meet the heightened requirements of Rule 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 77z-1, 78u. We affirm the District Court's Order dismissing the Second Amended Complaint and hold that DeKalb waived its right to further amendment of its Complaint by taking the instant appeal.

## I

On April 07, 2004 Dekalb brought a claim in the United States District Court for the Northern District of Georgia for securities fraud as a putative class action against NDCHealth Corporation ("NDC"), several of its officers ("Individual Defendants"), and the accounting firm Ernst and Young LLP ("E&Y"). DeKalb set forth two causes of action in its Second Amended Complaint: (1) securities fraud pursuant to Section 10(b), 15 U.S.C. §78j(b) and Rule 10b-5, 17 CFR § 240.10b-5; and (2) violation of Section 20(a) of the

---

[*]Honorable Arthur L. Alarcón, United States Circuit Judge for the Ninth Circuit, sitting by designation.

Exchange Act, 15 U.S.C. 78t.

The gravamen of the Second Amended Complaint is that during the class period of August 21, 2002 through August 9, 2004, NDC "engaged in a variety of undisclosed accounting manipulations and business practices which caused the Company's financial results to be materially overstated." DeKalb alleges that NDC engaged in channel stuffing;[1] prematurely recognized sales revenue; did not follow Generally Accepted Accounting Principles; and materially misstated the value of a failed investment in a company known as MedUnite. E&Y is being sued because it served as NDC's independent auditor and issued audit opinions on the Company's 2003 and 2004 financial statements.

NDC and E&Y filed motions to dismiss DeKalb's Second Amended Complaint on October 13, 2004. After the opposition and reply papers were filed, on January 5, 2005, NDC filed a Form 8-K and a Form 12b-25 document with the SEC disclosing that it would restate its accounts for the prior period "beginning with its fiscal year ended May 31, 2002 through the first quarter of fiscal year

---

[1]Channel stuffing is a practice whereby a company floods distribution channels by employing incentives to induce customers into purchasing their products in large quantities, creating a short-term bump in revenue and excess supply in the distribution chain. *See e.g. In re Scientific-Atlanta Inc., Securities Litigation,* 239 F. Supp. 2d 1351, 1355 (N.D. Ga. 2002) ("'channel stuffing' has the effect of shifting earnings into earlier quarters to the detriment of earnings in later quarters.").

2005 ended August 27, 2004." The District Court took judicial notice of these documents.[2] The Second Amended Complaint contains no allegation regarding the restatement of accounts.

The District Court dismissed Appellant's Second Amended Complaint on July 27, 2005 with leave to amend. The order states: "Plaintiff shall file its Third Amended Complaint within thirty (30) days of entry of this Order, and Defendants shall file their motions to dismiss within thirty (30) days of the filing of the Third Amendment." *In re NDC Health Corp. Inc.,* No. 1:04-cv-0970, slip op. at 53 (N.D. Ga. July 27, 2005). Instead of filing a third amended complaint, DeKalb filed a Notice of Appeal on August 26, 2005, the last day of the period allotted for filing an amended complaint.

---

[2]On a motion to dismiss for failure to state a claim upon which relief can be granted, if "matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." Fed. R. Civ. P. Rule 12(b). Normally, "once the court decides to accept matters outside the pleading, it must convert the motion to dismiss into one for summary judgment." *Property Mgmt. & Inv., Inc., v. Lewis*, 752 F.2d 599, 604 (11th Cir. 1985) (citing *Carter v. Stanton*, 405 U.S. 669, 671 (1972)). However, in the context of securities fraud, "SEC documents [may be treated] as public records capable of being judicially noticed at the motion to dismiss stage." *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1280 (11th Cir. 1999). By taking judicial notice of SEC documents, the District Court did not transform Defendants' motions to dismiss into a motion for summary judgment. *Id.*

## II

On September 13, 2005, this Court inquired *nostra sponte* whether the District Court's Order of July 27, 2005 constitutes a final appealable order. In response, the parties agreed that "[g]enerally, an order dismissing a complaint is not final and appealable unless the order holds that it dismisses the entire action or that the complaint cannot be saved by amendment." *Van Poyck v. Singletary*, 11 F.3d 146, 148 (11th Cir. 1994) (citing *Czeremcha v. Int'l Ass'n of Machinists and Aerospace Workers, AFL-CIO*, 724 F.2d 1552, 1554-55 (11th Cir. 1984)).

"[W]here an order dismisses a complaint with leave to amend within a specified period, the order becomes final (and therefore appealable) when the time period allowed for amendment expires." *Briehler v. Miami*, 926 F.2d 1001, 1002 (11th Cir. 1991). However, "the plaintiff need not wait until the expiration of the stated time in order to treat the dismissal as final, but may appeal prior to the expiration of the stated time period." *Schuurman v. Motor Vessel "Betty K V,"* 798 F.2d 442, 445 (11th Cir. 1986). Accordingly, this Court has jurisdiction over this timely filed appeal pursuant to 28 U.S.C. § 1291. By filing an appeal in this manner, however, DeKalb elected to stand on its Second Amended Complaint and waived its right to further amendment. *Schuurman,* 798 F.2d at 445 ("Once the plaintiff chooses to appeal before the expiration of time allowed for amendment,

5

however, the plaintiff waives the right to later amend the complaint, even if the time to amend has not yet expired.").

## III

DeKalb argues the District Court erred in dismissing its Second Amended Complaint because, in determining that DeKalb did not plead facts sufficient to give rise to a strong inference of scienter, "[t]he District Court failed to consider all of the facts pled and also failed to view the allegations in a light most favorable to Appellant." (Appellant's Br. 34.) DeKalb also argues that "the District Court erred in determining that Appellant failed to plead the reasons for the falsity of the alleged misstatements and omissions with requisite specificity." Finally, Dekalb assigns error to the District Court for "improperly impos[ing] conditions on Appellant's right to amend its complaint."

"At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1273 n.1 (11th Cir. 1999). The "court reviews *de novo* the dismissal of a complaint pursuant to Rule 12(b)(6)." *Oxford Asset Mgmt. v. Jaharis*, 297 F.3d 1182, 1187 (11th Cir. 2002).

Section 10(b) and Rule10b-5 make it unlawful for any individual to employ a manipulative or deceptive device in connection with the purchase or sale of any

6

security.[3]  "To allege securities fraud under Rule 10b-5, a plaintiff must show: 1) a misstatement or omission, 2) of a material fact, 3) made with scienter, 4) on which plaintiff relied, 5) that proximately caused his injury." *Bryant*, 187 F.3d at 1281.

Section 20(a) of the Exchange Act provides for liability of "controlling persons" who aid and abet "any person liable under any provision of this chapter or of any rule or regulation thereunder." 15 U.S.C. 78t. Dekalb's claims under

---

[3]Section 10(b), 15 U.S.C.S. § 78j, provides:

> To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement (as defined in section 206B of the Gramm-Leach-Bliley Act [15 USCS § 78c note]), any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5, 17 C.F.R. § 240.10b-5, was promulgated under Section 10(b) and provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

Section 20(a) are alleged against the Individual Defendants, and predicated upon the same alleged unlawful conduct relevant to its claims under Section 10b. (Compl. ¶ 186.) Accordingly, the success of DeKalb's section 20(a) claim turns on the resolution of its claims under Section 10b and Rule 10b-5.

**A**

Channel stuffing is not fraudulent *per se. Greebel v. FTP Software, Inc.*, 194 F.3d 185, 202 (1st Cir. 1999) ("There is nothing inherently improper in pressing for sales to be made earlier than in the normal course."). In *Greebel,* the First Circuit commented that in the context of alleged improper revenue recognition, "channel stuffing evidence has some probative value. But that value is weak." *Id.* at 203; *but see In re Cabletron Sys.*, 311 F.3d 11, 26 (1st Cir. 2002) (allegations of improper revenue recognition, including fictitious sales, and channel stuffing, were supported by averments of testimonial evidence from insiders and pled with adequate specificity to survive a motion to dismiss). The Seventh Circuit determined in *Makor Issues & Rights, Ltd., et al., v. Tellabs, Inc.*, 437 F.3d 588 (7th Cir. 2006) that "[w]hile there may be legitimate reasons for attempting to achieve sales earlier via channel stuffing, providing excess supply to distributors in order to create a misleading impression in the market of the company's financial health is not one of them." *Id.* at 598. We agree with the

8

Seventh Circuit that channel stuffing may amount to fraudulent conduct when it is done to mislead investors, but the allegations of channel stuffing in the instant case were not pled with sufficient detail to overcome the PSLRA's scienter hurdle.

Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."[4] Fed. R. Civ. P. Rule 9(b). "Rule 9(b) is satisfied if the complaint sets forth '(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.'" *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1202 (11th Cir. 2001) (quoting *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1371 (11th Cir. 1997)). "A sufficient level of factual support for a [10b] claim may be found where the circumstances of the fraud are pled in detail. 'This means the who, what, when where, and how: the first paragraph of any newspaper story.'" *Gross v. Medaphis Corp.,* 977 F. Supp. 1463, 1470 (N.D. Ga. 1997) (quoting *DiLeo v.*

---

[4]Rule 9(b) states: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Fed. R. Civ. P. Rule 9(b).

*Ernst & Young,* 901 F.2d 624, 627 (7th Cir. 1990)).

For claims brought under the Exchange Act, including Appellants' claims under Section 10b and Section 20a, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).[5]

DeKalb argues that it set forth a claim satisfying the requirements of Rule 9(b) and the PSLRA when it alleged that NDC understated expenses in violation of GAAP in three ways: "(1) it began to capitalize costs well before its development projects reached 'technological feasibility;' (2) it amortized costs over periods much greater than the economic life of its software assets; and (3) it applied an excessive burden factor to its capitalized costs, thereby expensing less

---

[5]Section 77u-4(b) provides:
(1) Misleading statements and omissions
In any private action arising under this chapter in which the plaintiff alleges that the defendant--
(A) made an untrue statement of a material fact; or
(B) omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading; the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

than necessary in the present term." In discounting this argument, the District Court stated "Plaintiff's allegations are thin, and are based almost entirely on statements by an undisclosed former executive in the Physician Services Group." *In Re NDC Health Corp. Inc.,* No. 1:04-cv-0970, slip op. at 44.

The District Court did not err because Dekalb's allegations regarding amortization and capitalization are vague and difficult to evaluate. For example, the Second Amended Complaint does not specify when the improper accounting occurred. It also fails to allege how and what products were improperly capitalized or amortized.

DeKalb also argues that the District Court erred in holding that DeKalb's allegations regarding material misstatement in NDC's financial statements were overly speculative and amount to nothing more than "non-actionable corporate mismanagement." The District Court determined that "the financial reporting was itself accurate" and the reports "accurately reflected the performance of the Company." At the time the District Court issued its opinion, NDC had already declared its intention to restate its accounts. On January 05, 2005, NDC filed a disclosure with the SEC stating that it "identified certain practices regarding the exchange of physician software inventory held by the Company's value-added resellers that were inconsistent with Company policies." Accordingly, NDC

11

announced that "after discussion with the Company's independent accountants, on January 4, 2005, the Audit Committee of the Board of Directors determined it is appropriate to restate prior-period results beginning with its fiscal year ended May 32, 2002 through the first quarter of fiscal year 2005 ended August 27, 2004." NDC also noted that "[t]he restatement will also include other identified adjustments from prior periods." It follows that NDCs prior financial reporting may not have been accurate and may not have reflected the performance of the company.

DeKalb elected to stand on its Second Amended Complaint. NDC's intention to restate its accounts is not alleged in the Second Amended Complaint. Because DeKalb waived its right to file a third amended complaint, we limited our review to the facts set forth in the Second Amended Complaint instead of speculating whether DeKalb could have filed a third amended complaint that would have met the pleading requirements of the PSLRA and Rule 9(b).

Turning to the allegations set forth in the Second Amended Complaint, DeKalb maintains that it alleged improper revenue recognition with adequate specificity by stating that in March of 2004, "a management level employee in the Physician Services unit" notified E&Y of a "dire situation facing that business segment – that accounts receivable were very high as a result of aggressive

12

channel-stuffing practices, which rendered the unit's reported revenues highly suspect." (Compl. ¶ 61.) According to DeKalb, NDC "determined that approximately $25 million of inventory was in the channel as of March 31, 2004." (*Id.* at ¶ 63.) The Second Amended Complaint goes on to state that, after management learned of this information, NDC decided to "delay its earning release pending a review of its revenue recognition practices in the Physician Services Unit." (*Id.*) In sum, DeKalb alleged that NDC issued erroneous financial statements that contained substantial misstatements due to the improper recognition of revenue and channel stuffing in the Physician Services Unit.

DeKalb also alleged that "Defendants sought to conceal their improper revenue recognition by increasing reserves and taking large, year-end charges for uncollected receivables, without explanation." Absent from these allegations are any detailed allegations of scienter with respect to the alleged misrepresentations.

**B**

DeKalb argues it was plain error for the District Court to conclude "that the Complaint does not contain allegations sufficient to give rise to a strong inference of scienter with respect to Appellees[.]" A complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with

13

the required state of mind." 15 U.S.C. § 78u-4(b)(2).[6] "This [statutory]

requirement alters the usual contours of a Rule 12(b)(6) ruling because, while a

court continues to give all reasonable inferences to plaintiffs, those inferences

supporting scienter must be strong ones." *In re Cabletron Sys.*, 311 F.3d at 28

(citing *Greebel*, 194 F.3d 185, 201 (1st Cir. 1999)). "[F]actual allegations may be

aggregated to infer scienter and must be inferred for each defendant with respect

to each violation." *Phillips v. Scientific-Atlanta, Inc.*, 374 F.3d 1015, 1016 (11th

Cir. 2004).

Dekalb contends "the District Court fail[ed] to properly consider all scienter

allegations in the aggregate, [and] the Court patently failed to interpret the

allegations in a light most favorable to Appellant." "[A] securities fraud plaintiff

must plead scienter with particular facts that give rise to a strong inference that the

defendant acted in a severely reckless manner." *Bryant*, 187 F.3d at 1287.

"'Severe recklessness is limited to those highly unreasonable omissions or

misrepresentations that involve not merely simple or even inexcusable negligence,

---

[6]Section 77u-4(b)(2) provides:
(2) Required state of mind
In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.'" *Id.* at 1282 n.18 (quoting *McDonald v. Alan Bush Brokerage Co.*, 863 F.2d 809, 814 (11th Cir. 1989)).

Turning to the salient allegations of scienter set forth in the Second Amended Complaint, DeKalb alleged that Defendants Hoff and Miller attended monthly operations meetings in Arizona and "every aspect of the Physician Services business was discussed in detail, including the aggressive channel stuffing and mounting problems with accounts recevable (sic)." (Compl. ¶ 56.) In the Second Amended Complaint, DeKalb alleged that testimonial evidence provided by a "former senior executive" would show Defendants Miller and Hoff knew there was a problem with "mounting accounts receivable" but decided to continue with "aggressive discounting and credit terms" because the company had to "make its numbers."[7]

---

[7]In its Second Amended Complaint, DeKalb avers:

According to the former senior executive, Defendants Miller and Hoff often discussed the difficult tension between the rising accounts receivable and the aggressive discounting and extended credit terms being given to VARs on the one hand, and the need for the Company to "make its numbers," on the other. The senior executive related that Hoff and Miller remarked that the Company was

15

Absent from these allegations are any particularized averments of fraud or scienter. In *Theoharous v. Fong*, 256 F.3d 1219 (11th Cir. 2001), this Court held that scienter was not pled with adequate specificity "because the plaintiffs did not allege the *context* in which Fong made this statement, [and] it does not appear from the face of the complaint that Fong must have known that the statement presented a danger of misleading buyers or sellers." *Id.* at 1225. As in *Fong,* DeKalb's broad claim of testimonial evidence is not set forth with requisite detail because DeKalb failed to allege what was said at the meeting, to whom it was said, or in what context. Accordingly, the averment lacks the requisite particularity. It is well established that "claims of securities fraud cannot rest 'on speculation and conclusory allegations.'" *Hoffman v. Comshare, Inc. (In re Comshare Inc. Sec. Litig.)*, 183 F.3d 542, 553 (6th Cir. 1999) (quoting *San Leandro Emergency Med. Plan v. Philip Morris Co.*, 75 F.3d 801, 813 (2d Cir. 1996). A general allegation that Individual Defendants promoted channel stuffing at a series of meetings does

---

'quarter driven,' and that the need to sustain reported revenue growth outweighed the need to properly address the mounting accounts receivable and the attendant questionable revenue recognition. Instead of addressing growing concerns of managers in the unit that the aggressive discounting, channel-stuffing, and extended credit terms. . . were creating serious realizability (sic) concerns . . . Defendants Hoff and Miller directed the unit to forge ahead and continue to aggressively stuff the channel in order to give the appearance of robust revenue growth.

(Compl. ¶ 57.)

16

not establish scienter.

DeKalb also avers that the Individual Defendants, Mssrs. Hoff, Hutto and Miller, made a PowerPoint presentation in Atlanta on March 1, 2004 that "contained several statements identifying problems with the VAR channel." The presentation included discussion of the following topics: "Heavy promotion discounting to drive VAR sales," and "Change ordering/buying behavior of Vars from Q/E promotion discount buying to pull through demand buying and add additional VARs". DeKalb also alleges: "Identified as 'Conditions for Success/Risks' (sic) were 'VAR accounts receivable collections' and 'Visibility into VAR inventory levels and outbound programs/assistance to move inventory physician practices (pull through sales).'" DeKalb maintains that these allegations establish a strong inference of scienter on the part of the individual defendants. We disagree.

Viewing these confusing statements in the best possible light, it is possible to surmise that the Individual Defendants might have been aware of improper revenue recognition in the VAR channel and also knew that they needed to increase actual sales rather than "promot[e] discount buying." But that conclusion is based on multiple inferences and drawn from somewhat baffling language. DeKalb failed to allege what was actually discussed at the meeting. Accordingly,

the allegation regarding the meeting of March 1, 2004, does not give rise to a strong inference of scienter.

DeKalb also argues that the personal certifications required by the Sarbanes-Oxley Act and signed by senior executives "are indicia of Defendants' scienter." Dekalb contends that by signing the certification, Defendants represented to the general public that: "(1) they reviewed the filing being certified; (2) the report did not contain any untrue statement of material fact . . . ; (3) the report fairly presented the financial condition of the company; and (4) they designed the disclosure controls and procedures to ensure that material information relating to the Company was disclosed to them for the period in question."

The plain meaning of the language contained in Sarbanes-Oxley, 18 U.S.C. § 1350, does not indicate any intent to change the requirements for pleading scienter set forth in the PSLRA, 15 U.S.C. § 78u-4(2). Sarbanes-Oxley requires that the chief executive officer and chief financial officer certify "[e]ach periodic report containing financial statements filed by an issuer with the Securities and Exchange Commission . . ." 18 U.S.C. § 1350(a). The statute also provides for imprisonment of up to 10 years or a fine of $1,000,000 for any person who "certifies a periodic financial statement . . . knowing that the periodic report

accompanying the statement does not comport with all the requirements set forth in [section 13(a) or 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78m(a) or 78o(d))] . . ." 18 U.S.C. § 1350(c). An individual who "willfully certifies" such a statement is subject to a prison term of 20 years and a fine of up to $5,000,000. Nowhere in the statute is there any mention of civil liability or pleading requirements for scienter in civil actions brought for securities fraud.

"A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States,* 444 U.S. 37, 42 (1979) (citing *Burns v. Alcala*, 420 U.S. 575, 580-81 (1975)). When construing the meaning of a statute, "the beginning point must be the language of the statute, and when a statute speaks with clarity to an issue judicial inquiry into the statute's meaning, in all but the most extraordinary circumstance, is finished." *Estate of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 475 (1992) (citing *Demarest v. Manspeaker*, 498 U.S. 184, 190 (1991)). In the instant case, the statute does not speak to the issue of pleading scienter. The plain language of Sarbanes-Oxley evidences no congressional intent to alter the pleading requirements set forth in the PSLRA. 18 U.S.C. § 1350.

DeKalb's interpretation of Sarbanes-Oxley conflicts with the plain language

19

of the PSLRA. "'[W]hen two statutes are capable of coexistence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective.'" *J.E.M. Ag Supply v. Pioneer Hi-Bred Int'l*, 534 U.S. 124, 143-44 (2001) (quoting *Morton v. Mancari*, 417 U.S. 535, 551 (1974)). If we were to accept DeKalb's proffered interpretation of Sarbanes-Oxley, scienter would be established in every case where there was an accounting error or auditing mistake made by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA. We decline to adopt such an interpretation.

Instead, we hold that a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements. This requirement is satisfied if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other "red flags," that the financial statements contained material misstatements or omissions. In the instant case, there are no allegations in the Second Amended Complaint that indicate the presence of such "red flags" in the company's financial statements.

The Second Amended Complaint states that "the Physician Services accounts receivable grew from $200,000 to almost $11 million in approximately

20

eighteen months beginning in late 2002." By way of comparison, NDC announced that its revenue for the third quarter of 2003 was $116.1 million and net income was only $9.3 million. DeKalb alleged that "[i]n the fourth quarter (ended May 30, 2003 . . . ), NDC increased its allowance for doubtful accounts by $4.26 million, nearly seven times the average for the three previous quarters." (Compl. ¶ 68.) Those numbers are somewhat alarming because they indicate a relatively large amount of revenue that might never be realized. But those statements themselves do not appear to be untrue or misleading.

Viewing the allegations individually and in aggregate, the facts set forth in the Second Amended Complaint do not create a "strong inference" of scienter. *See* 15 U.S.C. § 78u-4(b)(2) (mandating "strong inference that the defendant acted with the required state of mind.") Accordingly, the District Court did not err in dismissing DeKalb's Second Amended Complaint.

## C

NDC argues that Dekalb did not have standing to bring a claim regarding the stated value of MedUnite because DeKalb did not purchase any stock until after the alleged fraudulent conduct occurred. Dekalb alleged that the impact of the sale of MedUnite was realized on March 19, 2003. (Compl. ¶ 75.) But Dekalb

did not buy stock until March 10 and 11, 2004. Accordingly Dekalb did not have standing to bring this claim because they did not buy the stock until long after the impact of the sale was realized. *See Marsh v. Armada Corp.*, 533 F.2d 978, 981-82 (6th Cir. 1976) ("Standing is established by allegations that plaintiffs bought or sold shares of the stock in question within a reasonable period of time after the allegedly fraudulent conduct occurred to support an inference of reliance."); *see also Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 730 (1975) (holding that "the plaintiff class for purposes of a private damage action under § 10(b) and Rule 10b-5 [i]s limited to actual purchasers and sellers of securities.").

## IV

DeKalb argues that the District Court erred in dismissing its Complaint against E&Y because E&Y certified NDC's financial accounts even though their practices did not comport with Generally Accepted Acounting Principles ("GAAP") and Generally Accepted Auditing Standards ("GAAS").[8] DeKalb alleged that E&Y ignored "red flags" when it issued unqualified audits and

---

[8]Generally Accepted Accounting Principles ("GAAP") are the "basic postulates and broad principles" that guide business accounting. *SEC v. Price Waterhouse*, 797 F. Supp. 1217, 1222-23 n17 (S.D.N.Y. 1992) (cited in *Ziemba*, 256 F.3d at 1200. GAAP is approved by the Auditing Standards Board of the American Institute of Certified Public Accountants ("AICPA"). *Id.* Generally Accepted Auditing Standards ("GAAS") are the standards prescribed by the AICPA for the conduct of auditors in the performance of an examination. *Id.* GAAP and GAAS establish guidelines for measuring, recording, and classifying a business entity's transactions. *Id.*

financial statements in 2003 and 2004.  (Compl. ¶¶ 151-54.)

**A**

DeKalb argues that anomalous increases in NDC's reserve for doubtful accounts put E&Y "on notice of the other Defendant's fraudulent scheme." Drastic overstatement of accounts, or other red flags, combined with alleged violations of GAAS or GAAP may be enough to establish the requisite level scienter.  *In re Eagle Bldg. Tech. Inc., Sec. Litig.,* 319 F. Supp. 2d 1318, 1328 (S.D. Fla. 2004) (finding sufficient particularity where fraudulent contracts made up 74% of the company's business, financial statements had 60 out of 75 line items restated, and red flags included *inter alia,* purchase order discrepancies in the hundreds of thousands, delivery discrepancies of 50% of goods, and post-dated license agreements); *see also In re Friedman's, Inc., Sec. Litig.,* 385 F. Supp. 2d 1345, 1365-66 (N.D. Ga. 2005) (finding a strong inference of scienter where auditing firm "had continuous arguments" with company management over allowance for uncollected accounts, the firm "knew that" the company was under-reserved, the firm discussed doubtful accounts every quarter, and the firm committed numerous GAAP and GAAS violations); *In re Hamilton Bankcorp., Inc., Sec. Litig.*, 194 F. Supp. 2d 1353 (S.D. Fla. 2002) (finding sufficient particularity where auditing firm committed numerous GAAP and GAAS

violations and ignored an investigation by the Office of the Comptroller of the Currency, the simultaneous sale and purchase of overpriced loans or securities to avoid write down on its books, and the corporation's failure to adhere to SEC requirements).

Red flags are "those facts which come to the attention of an auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *In re Sunterra Corp. Sec. Litig.*, 199 F. Supp. 2d 1308, 1334 (M.D. Fla 2002). "It is established, however, that the purported red flags cannot simply 're-hash' the alleged GAAP violations." *In re Spear & Jackson Sec. Litig.,* 399 F. Supp. 2d 1350, 1363 (S.D. Fla. 2005) (citing *Holmes v. Baker*, 166 F. Supp. 2d 1362, 1379 (S.D. Fla. 2001)).

DeKalb alleged that E&Y was put on notice of fraudulent activity by NDC's increased allowance for "doubtful accounts" in the fourth quarter of 2003 and 2004. (Compl. ¶ 67). DeKalb also claimed that "[a]n analysis of NDC's reserve for doubtful accounts and related charge-offs and recoveries for fiscal year 2003 and fiscal year 2004 reveals a pattern strongly suggesting that Defendants concealed overstated revenues for fiscal year 2003 and 2004 by increasing NDC's provision in the fourth quarter of both years and taking a large, anomalous charge for uncollectible accounts receivable. . . ." (*Id.*) The Complaint alleged

24

the first three quarters of fiscal year 2003 NDC provisioned at a modest rate and actually reported net recoveries on accounts receivable previously written off . . . [but] in the fourth quarter (ended May 30, 2003, and incidentally, the quarter in which NDC's independent auditors began to review the Company's financials in preparation for the filing of the Form 10-K), NDC increased its allowance for doubtful accounts by $4.26 million, nearly seven times the average for the three previous quarters.

(Compl. ¶ 68.)  DeKalb also alleged that "NDC charged-off over $6.1 million in uncollectible accounts receivable."  (*Id.*)  The Second Amended Complaint states that "[i]n fiscal, 2004, in spite of NDC's special review of its revenue recognition practices and reserves prior to the issuance of its third quarter results, the Company once again took an anomalous charge against its reserve of approximately $6.7 million, or 78% of its reserve [and] failed to give any explanation for these year-end results[.]" (*Id.*)  DeKalb alleged that this charge was "highly irregular given that NDC had purportedly experienced net recoveries for the first three quarters of fiscal year 2003 and modest provisioning and charge offs for the first three quarters of fiscal 2004."  (*Id.*)

DeKalb has not alleged any facts that show E&Y was actually aware or should have known that NDC recklessly "concealed overstated revenues."  *See Bryant*, 187 F.3d at 1287 (adopting the recklessness standard).  DeKalb does not allege facts that show that such increased allowances were so irregular as to put an

25

auditing company on notice for fraud. *See Ziemba,* 256 F.3d at 1210 (dismissing a complaint where auditing firm was not "tipped off"). The Second Amended Complaint states NDC chose the fourth quarter to start increasing the allowances for doubtful accounts "incidentally" at the same time E&Y "began to review the Company's financials." Since DeKalb has not alleged that E&Y knew about the alleged reason for the increased "irregular" allowance for doubtful accounts, or should have known about NDC's improper revenue recognition, DeKalb failed to plead facts giving rise to a strong inference of scienter.

## B

DeKalb alleged that "during March 2004, E&Y was notified by a management level employee in the Physician Services unit of the dire situation facing that business segment – that accounts receivable were very high as a result of aggressive channel-stuffing practices, which rendered the unit's reported revenues highly suspect." (Compl. ¶ 61.) As a result of this notification, "the Company and Defendants were forced to begin addressing the problem." (*Id.*) The Second Amended Complaint does not assert that E&Y had knowledge of wrongdoing before March of 2004 and does not allege facts demonstrating that E&Y acted with reckless disregard after E&Y was informed of the problem. On the contrary, DeKalb alleged that when E&Y was "notified" of a "dire situation,"

26

E&Y took action.  DeKalb has not pled facts that indicate E&Y's response to the notice was highly unreasonable or an extreme departure from the standards of ordinary care.

## C

DeKalb's remaining allegations pertain to violations of GAAP or GAAS. "Allegations of GAAS or GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b)." *Ziemba,* 256 F.3d at 1208.  Such allegations do not create a strong inference of recklessness because "[t]hey merely suggest that either management or the accountant missed something, and may have failed to prepare or review the financial statements in accordance with an accepted standard of reasonable care."  *Reiger v. Price Waterhouse Coopers LLP*, 117 F. Supp. 2d 1003, 1010 (S.D. Cal. 2000), *aff'd sub nom. DSAM Global Value Fund v. Altris Software, Inc.,* 288 F.3d 385 (9th Cir. 2002).

In the Second Amended Complaint, DeKalb alleged that E&Y's audit report of July 21, 2003 "falsely represented that E&Y had conducted its audit for NDC's year end 2003 financial statements in accordance with GAAS, and that NDC's financial statements conformed with GAAP."  (Compl. ¶ 151.)  DeKalb alleged that E&Y violated GAAS by failing exercise due professional care, failing to design proper audit procedures, and by "failing to expand or otherwise properly

27

conduct its audit to detect the understatement in the allowance for doubtful accounts. . . ." (Compl. ¶¶ 156, 165, 168.) DeKalb also alleged that "E&Y failed to obtain sufficient competent evidential matter" with regards to write-offs, software capitalization, and improper revenue recognition. (Compl. ¶ 166.) DeKalb goes on to allege that these GAAS violations were caused by "E&Y's failure to qualify, modify or abstain from issuing its audit opinions, when it knew or recklessly turned a blind eye to NDC's accounting manipulations. . . ." (Compl. ¶ 158.)

While the DeKalb broadly claims that E&Y failed to design and implement proper auditing procedures, DeKalb never describes how E&Y failed to do so. For example, DeKalb refers to the American Institute of Certified Public Accountants' Codification of Statement on Auditing Standards, but DeKalb does not allege how E&Y violated each section. DeKalb alleged that if E&Y had not violated GAAP and GAAS the supposed fraud would not have taken place. (Compl. ¶ 158) However, DeKalb may not "establish scienter by alleging that the auditor would have discovered the fraud had it not violated GAAS." *In re Spear & Jackson Sec. Litig.,* 399 F. Supp. 2d at 1363 (citing *In re Eagle Bldg. Tech. Inc., Sec. Litig.*, 319 F. Supp. 2d at 1328). This is merely an allegation of negligence.

DeKalb states that E&Y "recklessly turned a blind eye" to the problems at

28

NDC.  But merely alleging scienter in general, conclusory terms does not meet the particularity requirement.  15 U.S.C. § 78u-4(b)(2).  The District Court did not err in granting E&Y's motion to dismiss.

**V**

DeKalb waived its right to file a third amended complaint by filing the instant appeal.  But that does not moot the issue because a question remains as to whether the restrictions on further amendment were overly burdensome. Federal Rule of Civil Procedure Rule 15(a) states that leave to amend "shall be freely given when justice so requires."[9]  Denial of leave to amend is reviewed for abuse of discretion.  *Baez v. Banc One Leasing Corp.,* 348 F.3d 972, 973 (11th Cir. 2003).  In *Foman v. Davis*, 371 U.S. 178 (1962) the Supreme Court declared that trial courts have broad discretion in permitting or refusing to grant leave to amend. *Id*. at 182.  "In the absence of any apparent or declared reason -- such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to

---

[9]Rule 15(a) provides, in pertinent part:
A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served, or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be given freely when justice so requires.

cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. -- the leave sought should, as the rules require, be 'freely given.'" *Id.*

DeKalb argues the District Court erred in placing restrictions upon its right to further amend its Complaint because the District Court incorrectly premised the restrictions on "the interest of fairness and to manage this litigation effectively." DeKalb also argues that the District Court did not adhere to the factors in *Foman v. Davis,* 371 U.S. 178, 182 (1962). DeKalb's argument lacks merit because the District Court did not deny DeKalb leave to amend. The District Court explicitly considered at least two of the *Foman* factors in fashioning the restrictions placed on DeKalb's right to further amendment of its Complaint.

In discussing the issue of leave to amend, the District Court made the following comments: "The Eleventh Circuit requires leave to amend be granted where a more carefully drafted complaint might state a claim. Here, the Court was inclined to deny Plaintiff's request for leave to amend the Second Amended Complaint." *In re NDCHealth Corp., Inc. Securities Litigation,* No. 1:04-cv-0970, slip op. at 50. The District Court noted that "Plaintiff previously has amended its complaint twice."

The District Court gave DeKalb leave to amend because NDC's notice to

30

the SEC regarding the restatement of its accounts "may at least be germane to the claims asserted." *In re NDCHealth Corp., Inc. Securities Litigation,* No. 1:04-cv-0970, slip op. at 51 n.23. However, the District Court placed restrictions on Appellant's right to amend: "Plaintiff may amend its complaint but the amendment is limited to allegations (i) based on information not available to Plaintiff when the Second Amended Complaint was filed and (ii) which bear only on claims already asserted." *Id.* at 52.

"[I]n the exercise of sound discretion, the granting of leave to amend can be conditioned in order to avoid prejudice to the opposing party." *Allied Indus. Workers v. Gen. Elec. Co.*, 471 F.2d 751, 756 (6th Cir.) (quoting *Strickler v. Pfister Assoc. Growers, Inc.*, 319 F.2d 788, 791 (6th Cir. 1963)), *cert denied,* 414 U.S. 822 (1973). But the conditions placed on a plaintiff's right to amend its Complaint must be reasonable. *See id.* (holding the "requirement that the amendment be filed by a specified date or that the party amending bear a portion of the additional cost to the opposing party would, in proper circumstances, be reasonable conditions."); *see also Anderberg v. Masonite Corp.*, 176 F.R.D. 682, 687 (N.D. Ga. 1997) ("the court may under Rule 15(a), impose costs as a condition of granting leave to amend in order to compensate Defendant and avoid any prejudice caused by the amendment."); *Gen. Signal v. MCI Telecomm. Corp.*, 66

F.3d 1500, 1514 (9th Cir. 1995) (same); *Chicago Pneumatic Tool Co. v. Hughes Tool Co.*, 192 F.2d 620, 631 (10th Cir. 1951) (holding "it lay well within the range of sound judicial discretion of the court to allow the amendment in toto, to deny it altogether, or to permit it with reasonable conditions and limitations.").

In the instant case, the conditions placed upon DeKalb's right to amend were relatively modest. The District Court merely required that DeKalb limit its amendment to the legal theories already asserted, and permitted DeKalb to assert any new facts to state a claim. DeKalb has failed to demonstrate that these restrictions were unreasonable. Because DeKalb already had ample opportunity to file an amended complaint that meets the heightened pleading requirements of Rule 9(b) and the PSLRA, the District Court did not abuse its discretion by placing those restrictions on DeKalb's right to further amendment.

**AFFIRMED.**