**CITY OF PONTIAC GENERAL EMPLOYEES RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, Plaintiff,**

v.

**SCHWEITZER–MAUDUIT INTERNATIONAL, INC., Frederic P. Villoutreix and Peter J. Thompson, Defendants.**

**Civil Action No. 1:10–cv–00711–TCB.**

United States District Court,
N.D. Georgia,
Atlanta Division.

Aug. 26, 2011.

Darren J. Robbins, David C. Walton, Robbins Geller Rudman & Dowd, LLP, San Diego, CA, Douglas Wilens, Jack Reise, Paul J. Geller, Robbins Geller Rudman & Dowd, LLP, Boca Raton, FL, John C. Herman, Robbins Geller Rudman & Dowd, LLP, Atlanta, GA, Cynthia J. Billings, Sullivan, Ward, Asher & Patton, P.C., Southfield, MI, for Plaintiff.

David Alan O'Neal, John Ludlow Latham, Susan Elaine Hurd, Alston & Bird, LLP, Atlanta, GA, for Defendants.

## ORDER

TIMOTHY C. BATTEN, SR., District Judge.

This matter is before the Court on Defendants' motion to dismiss Plaintiffs' amended class action complaint [39].

## I. Factual and Procedural Background[1]

This securities fraud class action is brought by certain shareholders of Schweitzer–Mauduit International, Inc. ("Schweitzer" or the "Company") asserting claims under § 10(b) and § 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder. Plaintiffs are persons who purchased or acquired Schweitzer common stock between August 5, 2009 and February 10, 2010, inclusive (the "class period"). They allege that Schweitzer and two of its officers and directors, Defendants Villoutreix and Thompson (collectively, the "Individual Defendants"),[2] engaged in a fraudulent scheme to artificially inflate Schweitzer's stock price by misleading the market about (1) Schweitzer's relationship with one of its largest customers, (2) the strength of Schweitzer's intellectual property protections, and (3) pressures the Company was facing from European competitors. Plaintiffs claim that the truth was revealed to the market on February 10 and 11, 2010, at which time the stock price fell and caused Plaintiffs millions of dollars in losses.

### A. Defendant Schweitzer and Its LIP Cigarette Paper

Schweitzer, which is headquartered in Alpharetta, Georgia, is a multinational producer of specialty papers that supplies fine papers and reconstituted tobacco products to tobacco companies in the Americas, Europe, Asia and elsewhere. Schweitzer manufactures and sells, among other products, banded papers used in the production of lower ignition propensity ("LIP") cigarettes. LIP cigarettes are considered "fire safe" because they have demonstrated a reduced propensity to burn when left unattended. The most common fire-safe technology used by cigarette manufacturers is to wrap cigarettes with two or three thin bands of less-porous paper that act as "speed bumps" to slow down a burning cigarette. If a fire-safe cigarette is left unattended, the burning tobacco will reach one of these speed bumps and extinguish. All fifty states have passed legislation requiring LIP cigarettes, and European Union regulations will require cigarettes to be LIP-compliant by the end of 2011.

Schweitzer was one of the earliest developers of LIP technology, and it holds numerous patents in that field. According to a confidential source who worked as Schweitzer's senior corporate vice president of global LIP,[3] the Company was developing its LIP technology by 1995, but LIP technology did not become commercialized until 2003 or 2004, when state governments began requiring that cigarettes be LIP-compliant.

Schweitzer produces two types of LIP paper: online banded paper and offline banded paper. Online banded paper, also known as banded cigarette paper, employs moving orifice device ("MOD") technology to coat the cigarette paper with a solvent during the paper-making process at

---

1. On a motion to dismiss, the Court accepts as true all factual allegations set out in the complaint. *See Lotierzo v. Woman's World Med. Ctr., Inc.*, 278 F.3d 1180, 1182 (11th Cir.2002).

2. Throughout the class period, Defendant Villoutreix served as chairman of the board of directors and chief executive officer of Schweitzer, and Defendant Thompson was

Schweitzer's treasurer, chief financial officer and strategic planning officer.

3. The senior corporate vice president of global LIP worked for Schweitzer from January 15 through August 15, 2009, first as a full-time employee and then as an independent contractor, although he continued to work in the same capacity even after becoming an independent contractor.

Schweitzer's plant in Spotswood, New Jersey. The MOD technology was developed jointly by Schweitzer and Philip Morris USA ("PMUSA"). Because of PMUSA's proprietary interest in the MOD technology, it was the only one of Schweitzer's customers entitled to purchase online banded paper. Nevertheless, according to an anonymous source who formerly worked at Schweitzer as a senior account manager,[4] other customers could purchase online banded paper from Schweitzer if they paid royalties to PMUSA. Rather than pay royalties to PMUSA, Schweitzer's other customers typically purchase offline banded paper, which is traditional cigarette paper that is produced at Schweitzer's Spotswood plant or at its facility in Newberry, South Carolina. After coating the paper with a proprietary "Alginex" solution,[5] Schweitzer then sends the paper to outside companies—known as "converters"—that print the LIP bands on the paper at off-site locations.

## B. Schweitzer's Relationship with PMUSA

The first subject about which Defendants are alleged to have made false and misleading statements is the relationship between Schweitzer and PMUSA.

Schweitzer has disclosed that PMUSA is one of its four largest customers, and PMUSA allegedly had a lot of say in the manufacturing process at the Spotswood mill. An anonymous former lab tester[6] at Schweitzer's Spotswood mill was hired specifically to work on PMUSA's banded cigarette paper, and he understood that PMUSA wanted its own dedicated lab technicians and that PMUSA paid his salary, even though he was technically a Schweitzer employee. Additionally, another confidential source who worked at Schweitzer as a senior research scientist[7] claimed that PMUSA knew everything about Schweitzer's cost structure and that the contract between the two companies was more favorable to PMUSA than to Schweitzer and gave PMUSA a price advantage over its competitors. The anonymous senior account manager stated that the PMUSA contract permitted Schweitzer to fill PMUSA's orders before other customers' orders, regardless of the sequence in which the orders were received. The research scientist posited that Schweitzer might have been amenable to such an arrangement because PMUSA bought cigarette papers at a higher volume than other customers and because the prestige associated with manufacturing products for Philip Morris was a bargaining advantage

4. The senior account manager was employed with the Company in sales for twenty-three years, until August 2003.

5. Schweitzer launched its Alginex water-based technology for banded cigarette papers in 2008. This technology uses an all-natural alginate solution derived from seaweed, a thickening ingredient commonly used in the food industry. The Alginex solution retards air flow while (1) eliminating the potential negative taste characteristics associated with solvent coatings, and (2) giving customers more options for LIP-banded cigarette designs. Companies are also permitted to purchase the Alginex solution to apply to non-Schweitzer base paper.

6. The former lab tester was employed by Schweitzer for approximately ten years, until March 2010. His job duties included quality assurance testing of the various grades of paper (including the banded LIP paper) produced at the Spotswood mill and examining finished paper products to ensure that they met Company and customer specifications.

7. The former senior research scientist was employed by Schweitzer for approximately eighteen years, until August 31, 2006, and was involved in the development of the LIP technology.

when negotiating with potential overseas customers.

### 1. Concerns About Alternative Sourcing by Philip Morris

The senior research scientist explained that "Schweitzer and Philip Morris had worked together for years under an 'evergreen contract,' which referred to the 'single-source' nature of the contract." According to the former lab tester, in 2009 there was talk among Spotswood employees that PMUSA's contract with Schweitzer was coming to an end. Although he did not know specific details about the PMUSA contract, he believed PMUSA was switching from a multi-year agreement to a "year-to-year" contract. In October 2009, the Spotswood mill manager told employees that Schweitzer's overall contract with PMUSA had expired and that PMUSA would be researching whether it could buy banded paper from other manufacturers. The former lab tester had the impression that PMUSA wanted to move away from using the MOD technology and instead use the offline banded paper, which performed better than the online banded paper.

Plaintiffs allege that "in order to complete a stock offering in November 2009 and keep its stock price buoyed throughout the class period, Defendants misled the market to believe that its relationship with [PMUSA] was strong." Specifically, plaintiffs assert that "Defendants knew but failed to disclose threats to [the] significant relationship [between PMUSA and Schweitzer], including the fact that [PMUSA] had decided to use another supplier and it was sampling LIP paper printed by a U.S. converter on imported base paper."

Plaintiffs further contend that the truth was revealed in a conference call with analysts on February 11, 2010. Between February 10 and 11, 2011, Schweitzer's stock price fell from $70.23 to $46.65, approximately a thirty-four-percent decline. On February 12, Schweitzer issued a press release clarifying that PMUSA intended to "develop or explore alternatives to their MOD technology for their LIP needs ... on a volume of their requirements that is not material to [Schweitzer]'s ongoing supply of MOD product."

### 2. Dispute Over Cost–Plus Agreement Calculations

The pricing arrangement between PMUSA and Schweitzer, known as a "cost-plus agreement," provided that PMUSA would reimburse Schweitzer for its costs in manufacturing the online banded paper and then pay an additional agreed-upon amount to allow for a profit. In mid–2009, PMUSA began disputing the manner in which Schweitzer calculated its costs. On November 3, 2009, Schweitzer disclosed that as of September 30 the amount challenged by PMUSA was between $3 and $4 million and that failure to resolve the dispute could lead to litigation with PMUSA. Notwithstanding the dispute over the cost-plus agreement, however, PMUSA continued to pay in full all the invoices received from Schweitzer.

Plaintiffs claim that "Defendants knew but failed to disclose the extent of the Company's dispute with [PMUSA] over their cost-plus agreement." They claim the truth was revealed to the market on February 10, 2010, when Schweitzer issued a press release in which it disclosed that the total amount in dispute had grown to approximately $9 million due to additional invoices sent to PMUSA during the fourth quarter of 2009. The next day, as explained above, Schweitzer's stock price fell approximately thirty-four-percent. Then, on August 4, 2010, Schweitzer revealed that the amount in dispute had grown to $15.8 million.

## C. Schweitzer's IP Protections and European Competition

The remaining misrepresentations allegedly made by Defendants relate to the strength of Schweitzer's intellectual property portfolio and pressures Schweitzer faced from European competition. Plaintiffs claim that "Defendants knew but failed to disclose to the market that the Company's competitive position with respect to LIP paper was not adequately protected from foreign competition. Indeed, Defendants knew that competitors in Europe were developing alternative methods to manufacture LIP banded paper and that efforts by other manufacturers to invade Schweitzer's territory were growing." Plaintiffs further assert that "Defendants continued to misleadingly tout the strength of the Company's intellectual property and competitive position in order to fool the market." Plaintiffs contend that as a result of Defendants' false statements and omissions, Schweitzer's stock price was artificially inflated throughout the class period, "enabling the Company to complete an offering in November 2009 of 1.8 million shares of common stock at an inflated price of $60 per share for gross proceeds of $108 million."

On February 10, 2010, after the market closed, Schweitzer announced that it had filed a patent infringement action against four of its competitors. In a press release issued on the same date, the Company also revealed that in December 2009 a competitor had filed objections with the European Patent Office contesting a patent granted to Schweitzer. The Company explained that the patent at issue was valid and enforceable while those objections were pending.

## D. Alleged Class–Period Misrepresentations

In support of their claims, Plaintiffs cite a plethora of allegedly misleading statements made by Defendants in SEC filings, in press releases, or during conference calls. Although Plaintiffs identify three general categories of misrepresentations and omissions allegedly made by Defendants, the statements quoted in the amended complaint are not divided among those categories. Rather, under a section entitled "Defendants' False and Misleading Class Period Statements," Plaintiffs offer numerous block quotes, which are included here for reference. Except as otherwise indicated, all emphases are in the amended complaint.

First, Plaintiffs cite to the following language from an August 5, 2009 press release accompanying Schweitzer's second-quarter 2009 Form 8–K:

> ALPHARETTA, GA, August 5, 2009—Schweitzer–Mauduit International, Inc. (NYSE: SWM) ("Schweitzer–Mauduit" or "the company") today reported second quarter 2009 earnings results for the period ended June 30, 2009.
>
> *      *      *
>
> Second Quarter Operational Highlights:
>
> Continued strong growth in high-value products
>
> Expanding demand for Low Ignition Propensity (LIP) in North America and beyond
>
> *      *      *
>
> Frederic Villoutreix, Chairman of the Board and Chief Executive Officer, commented, "Our second quarter results further build on our first quarter earnings improvement and are indicative of the successful implementation of our operating and financial strategy. We are benefitting from restructuring initiatives aimed at transforming our core manufacturing operations toward higher-value products. We drove strong results in the second quarter, exceeding our own

expectations for operating profit margin gains and free cash flow."

Mr. Villoutreix continued, "Our year-to-date performance gives us confidence in both our plan and in our ability to execute that plan. Our near term strategy will continue to focus on our ongoing transformation that better positions us to effectively manage through these uncertain economic times. *We are focused on cost control, operational efficiency and the delivery of earnings growth from our high value LIP and reconstituted tobacco products. As a result of our record-level second quarter results, coupled with a less uncertain general economic outlook for the balance of the year, we now expect to achieve full-year earnings better than $3.50 per share, excluding restructuring and impairment expenses but including expected incremental operating losses ranging from $0.42 to $0.47 per share related to the closure of the Malaucene facility.*

Second, Plaintiffs include language from Schweitzer's second-quarter 2009 Form 10–Q:

Based upon states that have passed LIP regulations, demand for this product is expected to grow from the current level of approximately 49 percent of North American cigarette consumption to approximately 89 percent by early 2010. Additionally, states representing essentially all of North American consumption have either passed or proposed LIP regulations, and all major cigarette producers have announced voluntary national distribution of this technology, supporting the likelihood that LIP cigarettes will be sold nationwide by late 2009 or early 2010. *As a result, we expect to realize continued growth in demand for cigarette paper used in LIP cigarettes, which would continue to signif-*

*icantly benefit our U.S. business unit's results.*

\* \* \*

International LIP efforts continue, especially in the European Union, or EU. Australia will implement LIP regulations effective in March 2010 and Finland will follow with implementation in April 2010. The compliance test standards for Australia and Finland are consistent with test standards in Canada and the United States. In July 2009, SWM announced that the British American Tobacco affiliate in Australia, which has an approximately 60 percent share of that market, will exclusively use SWM's Alginex® banded papers.

\* \* \*

In June 2008, the EU's Standardization European Committee, known as CEN, mandated development of an ignition propensity standard. This standard is currently under development by working groups within the International Organization for Standardization, known as ISO, with expectations that the standard will be published by late 2010 or early 2011. Implementation of LIP regulation in the EU is expected by 2012. Additionally, other countries including South Korea, South Africa and Brazil are discussing possible LIP regulation. *These actions indicate that it is increasingly likely LIP cigarette regulations outside of North America will become effective in the next 1 to 3 years thus increasing demand for SWM's banded cigarette paper technology used in these cigarettes.*

\* \* \*

Accordingly, we have begun implementing plans to establish LIP production capability in Europe with a planned commencement of operations during early 2010 and continue to work with

our customers to finalize product developments and establish supply terms. We continue to study further LIP production capacity plans to meet the full extent of EU demand for cigarette paper used in LIP cigarettes and expect to select a location for a second production site in Europe. *These legislative and capacity planning developments involving LIP requirements are positive for us given our leadership position in this technology with our Alginex® banded papers and ability to provide one or more commercially proven LIP solutions to cigarette manufacturers.*

\*   \*   \*

The U.S. segment's operating profit was $12.5 million in the three months ended June 30, 2009, an $8.6 million increase from $3.9 million in the prior-year quarter. Higher selling prices and changes in the mix of products sold increased operating profit by $10.4 million, *primarily due to higher sales of cigarette paper for LIP cigarettes.*

\*   \*   \*

Several factors driving the improved second quarter results are expected to continue for the remainder of 2009. *We expect to realize further benefit from increased sales of RTL and cigarette paper for LIP cigarettes, especially as the U.S. market implements what is now essentially 100 percent lower ignition propensity regulation by January 2010.* We also expect to initiate production of cigarette paper for LIP cigarettes during late 2009 to service our recently announced agreement to supply the Australian market.

\*   \*   \*

We remain focused on successfully executing our business strategies to deliver value to our shareholders and customers. The on-going transformation of Schweitzer–Mauduit puts us in a better position to effectively manage through these continuing uncertain economic times. *We will continue our increased attention to cost control, operational efficiency and the delivery of earnings growth from our high value LIP and reconstituted tobacco products. We are committed to maintaining the strength of our balance sheet by aggressively managing cash flows while making the necessary adjustments to maintain our competitiveness in our base paper business.*

Third, Plaintiffs quote the Sarbanes–Oxley ("SOX") certifications that accompanied Schweitzer's second-quarter 2009 Form 10–Q and that were signed by the Individual Defendants:

1. I have reviewed this quarterly report on Form 10–Q of Schweitzer Mauduit International, Inc. (the "Registrant");

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the Registrant as of, and for, the periods presented in this report;

4. The Registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a–15(e) and 15d–15(e)) and internal control over

financial reporting (as defined in Exchange Act Rules 13a–15(f) and 15d–15(f)) for the Registrant and have:

a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the Registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

c) Evaluated the effectiveness of the Registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d) Disclosed in this report any change in the Registrant's internal control over financial reporting that occurred during the Registrant's most recent fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

Fourth, Plaintiffs quote the following statements and exchanges that took place during an August 6, 2009 conference call with analysts:

*Defendant Villoutreix:* "Growth of our high value products, that is Low Ignition Propensity papers or LIP and Reconstituted Tobacco Leaf products or RTL remain strong and in line with our expectations at nearly 10% growth over the prior year period."

\*       \*       \*

*Ann Gurkin—Davenport—Analyst—* Okay. And then, last, if I could just get an update really on your confidence in your LIP patents outside of the U.S. at more of—as more countries look to require the use of LIP, I would think competitive pressures would intensify. And so what is your—your confidence level in patents on your process?

*Frederic Villoutreix*—Schweitzer–Mauduit International, Inc.—Chairman, CEO: *I would say our confidence level is good. We have some patents that were already granted in Europe.*

*Some others are in the final stage of application and we have good reason to believe that we have a solid IP protection there.*

\* \* \*

*David Sachs—Hockey Capital—Analyst*—Okay. Terrific. And Australia's BAT selected you in Australia, who else is left to select in Australia and then from Finland to other countries that's coming up and when would you expect the decision to be made in Europe on who the suppliers might be for LIP product?

*Frederic Villoutreix—Schweitzer–Mauduit International, Inc.—Chairman, CEO*—So let me answer that question. For Australia, BAT is a market leader in this country with the market coverage estimated at 60%. *The other big player is Phillip [sic] Morris International and I'll say, Phillip [sic] Morris International at this stage has not officially announced their technology decision. We had some indication, but they will adopt the online technology which we—the same as Phillip [sic] Morris USA (inaudible-accented language) have.* And so we anticipate that we could fill part of their needs knowing that there's a competitor in Spain that has also production capabilities. So this is just speculation at this stage. No decision has been made.

\* \* \*

[Frederic Villoutreix, continued] In terms of Europe, the European community is making progress in defining the standard for LIP regulation. We continue to believe as our customers that the LIP regulation is likely to become effective in late 2011–2012. And again, when we look at these time line [sic], likely the main customers will firm up their preliminary decision sometime in very late 2009, more likely 2010.

Fifth, Plaintiffs cite the following language from a November 3, 2009 press release that accompanied Schweitzer's third-quarter 2009 Form 8–K:

ALPHARETTA, GA, November 3, 2009—Schweitzer–Mauduit International, Inc. (N.Y.SE: SWM) today reported third quarter 2009 earnings results for the period ended September 30, 2009 and announced plans to construct an Asian greenfield production site to produce reconstituted tobacco leaf (RTL).

\* \* \*

Third Quarter/Year–To–Date Financial Highlights:

- Third quarter net income of $4.5 million; $24.9 million year-to-date

- Third quarter net sales of $184.5 million; $551.9 million year-to-date

\* \* \*

Third Quarter Operational Highlights:

- Continued growth in high-value products

- Growing demand for RTL products helped drive gains from this high-value product

- Expanding demand for Low Ignition Propensity (LIP) cigarette papers in North America and beyond

\* \* \*

Frederic Villoutreix, Chairman of the Board and Chief Executive Officer, commented, "Our third quarter results continue to build on the broad-based improvement in our business achieved in the first half of 2009. Our excellent results for the quarter demonstrate the continuing success of our restructuring initiatives to transform our core manufacturing operations toward higher-value products. During the quarter, we progressed in closing our Malaucene,

France production site and announced further restructuring activity in France and the U.S. resulting in additional restructuring and impairment expenses. These actions are anticipated to be the last of our downsizing steps for the foreseeable future and were due to continued declines in demand for our traditional tobacco-related papers in North America and western Europe. *We are focused in the near term on successfully executing the remaining restructuring activities, continuing to grow our RTL and LIP business* franchises and sustaining profitable operations at our Chinese paper joint venture, CTM. We are also excited to announce a major growth initiative: the planned approximate $117 million investment to establish a wholly owned greenfield RTL production facility in the Philippines."

Mr. Villoutreix continued, "By expanding RTL through a planned production facility in the Philippines, we expect to significantly strengthen our leadership position in this key product segment while expanding our presence in emerging markets with strong growth prospects. *Also, through our RTL and LIP technologies, we are poised to benefit from increased regulatory efforts to reduce undesirable aspects of cigarettes. The transformation of our RTL franchise into a truly global operation, ongoing efforts to expand our LIP franchise to Europe and beyond and the revitalization of our base paper business establishes a formidable foundation for future revenue and earnings growth.*"

"SWM is becoming a premier specialty company and living up to our vision of being the undisputed leader of engineered solutions to the tobacco industry. We now expect to achieve full-year 2009 earnings of at least $4.00 per share, excluding restructuring and impairment expenses but including expected operating losses of approximately $0.50 per share related to the closure of the Malaucene facility. *For 2010, we estimate earnings per share of approximately $5.00, excluding restructuring and impairment expenses, with growth attributable to expanding RTL and LIP sales, full year profitability at our China paper joint venture and sustained profitability in our base paper business despite expected pressures on current margins caused by lower demand, a likely difficult pricing environment for major customers' 2010 contract renewals and inflationary pressures.*"

Third Quarter 2009 Results

Net sales were $184.5 million in the three month period ended September 30, 2009, a 7% decrease versus the prior-year quarter.

\* \* \*

During the third quarter, Schweitzer–Mauduit benefited from favorable pricing impacts versus the comparable prior year period. The approximate 58% rate of the LILP regulation in effect in North American market by the end of the third quarter 2009 caused a 26% increase in sales volume of this high value product, as compared to the prior year quarter.

\* \* \*

Schweitzer–Mauduit announced today a quarterly common stock dividend of $0.15 per share. The dividend will be payable on December 28, 2009 to stockholders of record on November 23, 2009.

Sixth, Plaintiffs once again quote SOX certifications signed by the Individual Defendants. Although the second set of quoted SOX certifications accompanied Schweitzer's third-quarter 2009 Form 10–

Q, the language of the certifications is identical to those quoted above.

Seventh is the following language from Schweitzer's third-quarter 2009 Form 10–Q:

> Based upon the states that have passed LIP regulations, demand for this product is expected to grow from the current level of approximately 58% of North American cigarette consumption to approximately 100% by early 2010. Additionally, states representing essentially all of North American consumption have either passed or proposed LIP regulations, and major cigarette producers have announced voluntary national distribution of this technology, supporting the likelihood that LIP cigarettes will be sold nationwide by late 2009 or early 2010. *As a result, we expect to realize continued growth in demand for cigarette paper used in LIP cigarettes, which would continue to significantly benefit our U.S. business unit's results through 2010.*

> \* \* \*

> International LIP efforts continue, especially in the European Union, or EU. Australia will implement LIP regulations effective in March 2010 and Finland will follow with implementation in April 2010. The compliance test standards for Australia and Finland are consistent with test standards in Canada and the United States. In July 2009, SWM announced that the British American Tobacco affiliate in Australia, which has an approximate 60% share of the market, will exclusively use SWM's Alginex® banded papers.

> \* \* \*

> In June 2008, the EU's Standardization European Committee, known as CEN, mandated development of an ignition propensity standard. This standard is currently under development by working groups within the International Organization for Standardization, known as ISO, with expectations that the standard will be published by late 2010 or early 2011. Implementation of LIP regulation in the EU is expected by 2012. Additionally, other countries including South Korea, South Africa and Brazil are discussing possible LIP regulation. These actions indicate that is increasingly likely LIP cigarette regulations outside of North America will become effective in the next 1 to 3 years thus likely increasing demand for SWM's banded cigarette paper technology used in these cigarettes.

> \* \* \*

> Accordingly, we have begun implementing plans to establish a first LIP production facility in Europe with a planned commencement of operations during 2010 and continue to work with our customers to finalize product developments and establish supply terms. *We continue to study further LIP production capacity plans to meet the full extent of EU demand for cigarette paper used in LIP cigarettes and expect to select a location for a second production site in Europe. These legislative and capacity planning developments involving LIP requirements are positive for us given our leadership position in this technology with our Alginex® banded papers and ability to provide one or more commercially proven LIP solutions to cigarette manufacturers.*

> \* \* \*

> Schweitzer–Mauduit continues to advance the strategy to transform its base paper manufacturing operations to better fit the global tobacco market while growing its high value products, princi-

pally reconstituted tobacco and cigarette paper for LIP cigarettes.

\* \* \*

Several factors that drove improved third quarter results are expected to continue for the remainder of 2009. These include continuing growth in sales of RTL and cigarette paper for LIP cigarettes, especially as the U.S. market implements what is now essentially 100% lower ignition propensity regulation by January 2010 as well as initiation of sales to service expected Australian market needs.

\* \* \*

By expanding our RTL capacity with a new production facility in the Philippines, we expect to significantly strengthen our leadership position in this key product segment while expanding our presence in emerging markets with strong growth prospects. *Also, through our RTL and LIP technologies, we are poised to benefit from increased regulatory efforts to reduce undesirable aspects of cigarettes. The transformation of our RTL franchise into a truly global operation, ongoing efforts to expand our LIP franchise to Europe and beyond and the revitalization of our base paper business establishes a formidable foundation for future revenue and earnings growth.* SWM is becoming a premier specialty company is living up to our vision of being the undisputed leader of engineered solutions to the tobacco industry. In 2010, we expect to build upon our substantial growth in earnings being achieved in 2009. This growth is attributable to expanding RTL and LIP sales, full year profitability at our China paper joint venture and sustained profitability in our base paper business despite expected pressures on current margins caused by lower demand, a likely diffi-

cult pricing environment for major customers' 2010 contract renewals and inflationary pressures.

\* \* \*

We are presently the sole supplier of banded cigarette papers for use in LIP cigarettes to Philip Morris–USA for its U.S. requirements under a long-term supply agreement. This supply agreement is a cost plus arrangement, and Philip Morris–USA has advised us that it disagrees with the manner in which we have determined one aspect of the cost of this product as invoiced in the second and third quarters of 2009. Philip Morris–USA has exercised its contract right to have an independent party audit our cost calculation. We have provided Philip Morris–USA with the support for our calculation and confirmed that it was done in accordance with methodology consistently applied over the life of the supply agreement and in accordance with its terms. We anticipate that this matter could result in litigation between Philip Morris–USA and us. *As of September 30, 2009, the amount disputed was approximately $3 million to $4 million.*

Eighth, Plaintiffs quote a November 4, 2009 conference call with analysts during which Defendant Villoutreix said, "Growth of our high value products, LIP papers and RTL products, was impressive at nearly 24% over the prior year period." Plaintiffs go on to quote the following two exchanges from the same conference call:

*AnnÂ Gurkin—Davenport & Co.—Analyst*—Okay. Great. And then third, in your Q, you reference a dispute with Philip Morris USA. Any other details you can share on that? Or is there any risk that that contract can change and you will no longer be a sole supplier of LIP to PM USA?

*Peter Thompson—Schweitzer–Mauduit International—CFO*—The nature of the dispute that we disclosed in the Q is over the mechanics of how the current agreement works with Philip Morris USA for pricing of the banded cigarette product. Obviously there's a mechanism that's implied with that dispute because it's not a fixed price contract. And there's a dispute over one step in the calculation of pricing that obviously has fairly significant impact because of the stated $3 million to $4 million value of the dispute. But that's a specific issue related to current invoicing. *In terms of any change with Philip Morris USA going forward in our supply to them of the banded cigarette paper product, at this point, no, if there were a change in terms of an awareness that we had on a different sourcing or a different product form that was going to materially effect* [sic] *our operations, we would have to say so, or a change in the conditions of the supply agreement that we have, we would have to say so.* That's always a potential. Clearly, especially as the U.S. market declines and there's less and less volume, the Philip Morris USA product is dependent on the New Jersey mill. And as we've just announced, at some point, if volume gets too low, it's very difficult to effectively operate a facility. So, the risk of the product that Philip Morris currently uses for LIP is more tied to the volume issues and the economic viability of that single New Jersey facility than any other issues. *So, no, there's no specific news on changes in sourcing. But certainly that could happen at some point.*

\* \* \*

*David Sachs—Hocky Capital—Analyst*—If we switch over to LIP in Europe, assuming now the intellectual property that you have will carry over there, is there anyone that has a competitive offering or the European market could look similar to the U.S. market given your IP and possible market share increase from your current 33% or 35% of the base paper business?

*Frederic Villoutreix—Schweitzer–Mauduit International—Chairman, CEO*—I would say, David, that there is a significant amount of competitive activity in the evaluation of products but as of today none that have been validated by the multinationals. *My belief is it has a lot to do with the strength of our IP and patent portfolio.* And so, when we look at Europe, I think what we have signaled in the past is that we foresee the European market to be more competitive than the U.S. markets, elsewhere it's the position, our flagship technology as the preferred choice by the top four multinationals who command 90% market share in the EU and elsewhere to achieve that is to go with a combination of direct selling and licensing agreements.

Although Plaintiffs dedicate nearly seventeen pages of their amended complaint to the statements quoted above that are alleged to be false and misleading, they offer only two paragraphs explaining why those statements were false and misleading. Paragraphs 66 and 74 each state that the preceding paragraphs

were materially false and misleading when made or omitted to make such statements not false and misleading because: (a) Schweitzer's relationship with PMUSA—its largest customer—was threatened by contractual disputes that could have a material adverse effect on the Company's results of operations; (b) PMUSA had begun to seek out competitors to source its paper needs; (c) Schweitzer's competitive position was

not adequately protected from foreign competition as to LIP paper and such competitors were increasingly developing alternative methods to develop LIP paper; (d) Schweitzer's competitive position was much more precarious than represented by Defendants; (e) efforts by competitors to invade Schweitzer's market share were growing; and (f) for the reasons detailed herein, the SOX certifications signed by Defendants and incorporated in the Company's Forms 10–Q were false.

### E.  The Truth Is Allegedly Revealed

Plaintiffs assert that the truth emerged on February 10 and 11, 2010. Specifically, they contend that the following statements revealed to the market the true circumstances surrounding the relationship between PMUSA and Schweitzer, the threats faced by Schweitzer as a result of European competition, and the questionable strength of Schweitzer's intellectual property portfolio.

First, Plaintiffs quote Schweitzer's fourth-quarter 2009 form 8–K, which was filed on the last day of the class period, February 10, 2010:

> ALPHARETTA, GA, February 10, 2010—Schweitzer–Mauduit International, Inc. (N.Y.SE: SWM) today reported fourth quarter 2009 earnings results for the period ended December 31, 2009.
>
> \*     \*     \*
>
> Frédéric Villoutreix, Chairman of the Board and Chief Executive Officer, commented, "In a challenging economic environment, Schweitzer–Mauduit demonstrated the continuing success of our restructuring initiatives to transform our core manufacturing operations toward higher-value products and significantly strengthened its financial and liquidity position.  Over the last four years, we have re-engineered our company into a position of durable strength. With the closing of our Malaucene, France production site and the restructuring activities in France and the U.S., announced at the end of the third quarter, we have nearly completed the turnaround program begun in 2006.  We are now shifting our focus to building a great platform to grow our value-added products and Asian market share.  Our success continues to depend on developing industry-leading technologies and products, investing globally and delivering results for our customers."
>
> Mr. Villoutreix continued, "Our fourth quarter results were largely in line with our expectations.  We advanced our key strategic initiatives during the quarter, including concluding an agreement with our employees in France on the terms of a general staff reduction, achieving the full conversion to LIP cigarette paper supply for U.S. customers, securing land and commencing construction for our new reconstituted tobacco leaf (RTL) operation in the Philippines, generating a strong level of profitability from our China tobacco papers joint venture and finalizing the last of the shutdown activities for our Malaucene, France facility.  Operationally, we experienced significant paper machine downtime, as expected, in all segments, primarily related to customer demand levels and concluded annual supply agreement negotiations with major customers that were in line with our expectations."
>
> "We have recently made progress on two strategic fronts:  advancing plans for supplying LIP cigarette paper to the European market.  We anticipate announcing specific projects for both of these areas during the first half of 2010 and continue to expect growth in the demand for LIP in Europe beginning in

2011 and for RTL in China progressively through 2015. We also continue to closely monitor competitive LIP activity and are vigorously working to protect our market leadership and technology position in both LIP and RTL. We concluded a secondary offering of SWM common stock during November 2009 that secures the financing needed to advance these strategic opportunities."

*Schweitzer–Mauduit filed a patent infringement action February 8, 2010 in the United States District Court for the District of South Carolina, Charleston Division. See the separate press release today on this matter.*

\* \* \*

In this regard, the company has been advised by Philip Morris–USA that it disputes the manner in which the company has calculated costs for banded cigarette papers under a cost-plus based contract for this product. *As of December 31, 2009, the disputed amount is approximately $9 million. While the company believes that it has properly calculated the amount it invoiced, the ultimate resolution of this dispute, if unfavorable to the company, could have a material adverse effect on the company's results of operations.*

\* \* \*

Oppositions were filed in December 2009 with the European Patent Office (EPO) contesting the grant by the EPO to the company of patent number EP–1482815. The company believes that the EPO properly granted the patent and it intends to respond to the opposition arguments. However, the final resolution of the oppositions could result in the invalidation of the patent or a further limitation of the scope of the patent claims which could affect the competitive value of the patent. The outcome of this dispute would not prevent the company from practicing its Alginex® LIP solution.

Second, Plaintiffs quote the following language from a February 10, 2010 press release:

Schweitzer–Mauduit International, Inc. (NYSE: SWM) today announced its filing of a patent infringement action on February 8, 2010, in the United States District Court for the District of South Carolina, Charleston Division. The suit was filed against the following parties as defendants:

Delfort Group, an Austrian corporation

Astra Tobacco Corporation, a North Carolina corporation

Julius Glatz, GmbH, a German corporation

LIPtec, GmbH, a German corporation

The suit alleges that the defendants infringe United States Patent Number 6,725,867 based on the sale of cigarette papers in the U.S. that are designed for use in the manufacture of lower ignition propensity cigarettes. Schweitzer–Mauduit is represented by the firms of Jones Day and Buist, Moore Smythe & McGee, P.A.

*The company considers litigation to be a serious matter and does not undertake it lightly or in haste. However, we felt that it was appropriate to take this action now in light of our assessment of activities in the market.* Schweitzer–Mauduit has been engaged in the study of the mechanisms at work and the means for designing cigarette papers that aid in controlling the ignition of a cigarette for over 20 years. To our knowledge, this substantially predates work by any of our competitors in this area and is the foundation on which Schweitzer–Mauduit has built a portfolio of patents around the world that covers

a range of products and processes, in particular banding approaches, relating to this technology. In our view, our early work has allowed us to establish a strong intellectual property position on many of the fundamental techniques currently employed commercially to produce lower ignition propensity papers and our work continues to further develop this technology.

Third, and finally, Plaintiffs offer the following statements and exchanges that took place during a February 11, 2010 conference call with analysts:

Defendant Villoutreix: To the best of our knowledge, combined sales of online vended products to Phillip [sic] Morris USA and Schweitzer offline printed papers accounted for 50% of its demand for cigarette paper in 2009. 78% of the demand for LIP compliant papers. Since 2002, we have granted license[s] to permit two of our U.S. to have printers to use banded paper, using their own band forming solutions for a portion of their needs.

These accounts [sic] for essentially all of the volume LIP U.S. printer section, or 11% of total 2009 demands or about 14% of 2009 demands for LIP-compliant papers. *It is worth mentioning that Phillip USA [sic] has informed us of an intention to use LIP product printed by U.S. converter on imported base paper as a commercial alternative for one of their low-cost brands.* To date, we believe that the volume involved is very small. As previously communicated, we regularly retail [sic] competitive activity for the presence of other LIP products, and to determine if those products infringe on our granted patents.

*In light of our assessment of activities from several European competitors in the market and after completing a number of technical and legal evaluations, we have come to the conclusion that we have at [sic] a sound basis for legal action. Hence our decision to file a patent infringement action on Monday against Delfort Group, Julius Glatz, and others. This action is important given the advance of IP regulation in Europe. While it is not possible to predict the outcome of the litigation, we would not have initiated this action absent the sound belief that our position is well supported and our commitment is to see it through to its fine [sic] conclusion.*

Slide 9 gives a high-level view on our intellectual property, particularly as it relates to LIP patent protection. We have been engaged in the study of the mechanisms at work and the means for designing cigarette papers that aid in controlling the cigarette for over 20 years. To our knowledge, this substantially predates work by any of our competitors in this area, and is a foundation on which Schweitzer–Mauduit has built a portfolio of patents around the world, which cover a range of products and processes related to this technology. In our view, our early work has allowed us to establish a strong intellectual property position on many of the fundamental techniques currently employed commercially to produce lower ignition intensity papers and our work continue in developing this technology, including banding.

At the risk of oversimplifying the evaluation of the patents or patent portfolio, making comparisons between patent portfolios, one needs to consider a number of questions, such as: Are that [sic] any blocking patents that would prevent the patent owner from freely participating in patent litigation? To what extent does the patent force a competitor into a less desirable or less efficient method

for achieving the same end function? To what extent does the patent scope include functionality? In short the assessment of patents and patent portfolios is a highly technical, complex, and repetitive inquiry. One remark on Europe.

In early 2009, the European Patent Office (or EPO), used to achieve munition control properties of cigarette papers. Under our European patent practice any party of [sic] nine months following the grant of a patent to file a position. *Three parties filed such a position within the deadline.* We believe that the EPO was correct in granting the patent and will respond to the oppositions. The patent is valid and enforceable, while the opposition proceeding is pending.

Moving to slide 10 and a summary of our key business drivers for 2010. We have now concluded contract negotiations with key customers that resulted in pricing expectations in line with our internal goals. *Of note, the combination of volume decline in U.S. markets and the captive nature of the banded paper production starts with Phillip* [sic] *Morris USA, we reserve an able* [sic] *to maintain the same margins as in 2009 and other cost agreements.*

While this margin loss was fully included in our guidance for 2010, it will have meaningful effect on the profit margin of our U.S. segments. An effect that we intend to minimize through the timely realignments and our Spotswood operations on banded paper products, and other cost reduction initiatives already at work. More on this in Pete's coverage of our updated guidance from 2010. Now we fully expect to continue to grow our high-value products, LIP papers and products with growth in the high single digits this year.

\* \* \*

Defendant Thompson: Overall, our earnings guidance has improved $0.20 per share or 5% over our previous 2010 guidance due to continued stong business performance and despite $0.25 per share increase in wood pulp inflationary impacts, and a currently unfavorable euro to dollar exchange relationship. *Customer negotiations including approximately $6 million to $8 million lower expect* [sic] *profit on LIP sales to Phillip* [sic] *Morris in the US, under our cost-plus agreement are fully included in our updated guidance and are in line with our original estimates.* Global base paper operations are expected to sustain profitability during 2010, at roughly the same level as during 2009. Non-manufacturing expenses are expected to decline somewhat in 2010, despite expected increases in legal expenses. CTM results are not expected to sustain their fourth quarter pace, but are expected to achieve full-year profitability in 2010, at least 50% above full-year 2009 actual results.

\* \* \*

*Ian Zaffino—Oppenheimer & Co—Analyst*—Thank you very much. As far as the pricing environment, when you mentioned the weakness in pricing, can you just go over that as far as, is this more of a competitive thing in is this more, they're in your contract agreements or they're just concessions you make as you go forward. Any type of color there be helpful, thanks. Thanks.

*Peter Thompson—Schweitzer–Mauduit International—CFO*—Most of the change that we've seen that's been negative has been on the base paper or more commodity type products, and we had three of our major customers have glob-

al negotiation processes conclude through the fourth quarter, and we had expected that we would see low single-digit price declines on the base paper, and that's essentially what we saw. *The other significant item, of course, was the change in our pricing agreement with Phillip [sic] Morris on the banded project, as we mentioned, a $6 million to $8 million impact, included in our original guidance for 2010 and still included in our guidance for 2010.* On the high-value products, reconstituted tobacco and LIP, there we enjoy a much more stable pricing environment and don't see any issues with price deadlines. On LIP if there's price deadlines it would be part of our strategy to pass along cost improvement and lower the price point of the LIP proprietary product. Most of the price increase we saw were through negotiations. The customers benefited from negotiations this last fall, taking place at a time when there's been deflation. There's still softness in volume, especially in parts of the world like western Europe, and so they enjoyed more leverage, but it was in line with our expectations.

\* \* \*

*Ian Zaffino—Oppenheimer & Co—Analyst*—Okay. And then the other question would be the timing of these lawsuits that you're following, what was really, I guess, the straw that broke the camel's back here? Because it seemed like they had some market share. Why wasn't it done earlier? Have they reached a threshold that triggered something—any information will be helpful.

*Frederic Villoutreix—Schweitzer-Mauduit International—Chairman, CEO*—Let me take this question, as we've been consistent said, we've been monitoring the market for any sign of activity for the last several years. We have been conducting what I call our homework in terms of the business, the technical, the legal evaluations of some of these products we have seen in the marketplace, and each of these evaluations of some of these products we have seen in the marketplace, and each of these evaluations has its own timing and requirements and information to go forward. As we indicated in our earnings release, and the release about us finding a claim we have completed in this process, we have built the database, and also the conviction that it was time to take legal action, which is always the last resort.

*Ian Zaffino—Oppenheimer & Co—Analyst*—Have you filed any type of cease and desist, or are they still producing or—

*Frederic Villoutreix—Schweitzer-Mauduit International—Chairman, CEO*—I would say, right now, we have filed a claim, which gives us the option down the road to ask when appropriate, and petition the courts for such relief. In other words, we kept all of the options open.

\* \* \*

*Bill Chappell—SunTrust—Analyst*—Just want to hit on one issue that may or may not be in stock, but your comment on Phillip [sic] Morris sourcing to third party for printing outside your license, can you give us a little more detail on why they're doing that? Is it their ability to take the same licenses and do it for all their business, and how much of a hit if at all is that to your profitability?

*Frederic Villoutreix—Schweitzer-Mauduit International—Chairman, CEO*—Yes. Let me answer this. It's possible, through the supply agreement that we have in the USA, they have the

able [sic] to source offline print banded products outside of the contract. So their online banded product, we have an exclusive arrangement with them where 1% of the online products is to be supplied from Spotswood New Jersey. *In the discussions we had with Phillip [sic] Morris USA last year, it appears to us that the intention to assess an alternative product is essentially driven by security of supply considerations.*

Now 100% of the U.S. market has moved to LIP regulation, and and [sic] having one product, one mill to support their franchise. The current volume involved is very, very small, and, I would say on our side, you know, the technical evaluation is in progress in terms of whether this product may or not infringe with our patents. So we are doing the technical evaluation as well. But as you will understand, since it's in progress, I cannot elaborate further on this matter.

\*     \*     \*

*Richard Skidmore—Goldman Sachs—Analyst*—And then just one last question. In your risk section, you have the $9 million of disputed revenue from Phillip [sic] Morris USA. Can you talk a little bit about that and how you see that evolving?

*Peter Thompson—Schweitzer–Mauduit International—CFO*—Sure. Phillip [sic] Morris has disputed the calculation under our cost plus agreement for the pricing of the banded product, LIP product, and that dispute has been in place through since about the middle of 2009. It updated—the amount updated here based on the fourth quarter release based on purely the additional invoicing that we had. We don't know the way that Phillip Morris is determining that disputed amount. They're just saying,

"This is the disputed amount," which reserves their rights to seek relief against that amount. Yet at the same time they're paying their bills, and we're collecting that cash. We believe that we've calculated the pricing correctly under the formula. It's the same formula that that's been in place for many, many years, so we don't believe the dispute has any merit. The fundamental issue is with that the volume declines in the Spotswood facility, the cost-plus for that arrangement is going up, and as Frederic alluded to, when we get to the point where Phillip [sic] Morris is the only product being made at the facility, 100% of the cost is essentially going into that product. So I think it's more of a reaction to the situation that we face than any mechanical issues two [sic] the calculation of the price.

\*     \*     \*

*Ann Gurkin—Davenport & Co—Analyst*—And can you just review, again, your confidence in—I think you referenced you have been producing paper and your basis goes back for 20 years or so. Can you review that thought process and the basis for the confidence behind your patents?

*Frederic Villoutreix—Schweitzer–Mauduit International—Chairman, CEO*—Well, again, I think, if you—you know, we have disclosed some information about our patents, and something—we have not disclosed a lot more as we'll be taking a risk of weakening our patent right if we share our patents[.] My comments are going to be I would say a high level. They're at a high helpful [sic]. But if you look at the IP technologies, where they were 20 years ago and we were involved from day one, if we look at some—the patents and patent portfolio that we have developed over time, and we continue to level off around

LIP, it's very broad, and it's also something that we apply around the world. So we have sales to the U.S. market. *Obviously we are seeing some challenges right now, but it's fair to say that all companies will encounter these kinds of challenges.* We have a great legal team that are advising us, including key partners of Jones Day in New York City and Europe, and I think we are, again, in a position where we have to enforce and exercise our rights.

*Ann Gurkin—Davenport & Co—Analyst*—And the last question. Back on PM USA it's my understanding you slashed the cigarette paper that you produced out of Spotswood. Is there any risk that they are looking at changing that cigarette paper on their Marlboro brand in the US?

*Frederic Villoutreix—Schweitzer–Mauduit International—Chairman, CEO—No. I think at this stage, the only new developments last year, which is still am* [sic] *the very small scale is to use a printed band product on one of Phillip* [sic] *Morris USA's low-cost volume, talking about one or two stock-keeping units.* A very small amount. And so at this stage, my answer to your question would be no.

\*    \*    \*

*Jim Rice—GWI Asset Management—Analyst*—Pete, a little bit confused. I thought you guys had agreements with all of your major manufacturers that you sell to recognizing your IP. So how is Phillip [sic] Morris able to go and have a third party produce LIP paper? Are they paying any sort of license fee to you for that?

*Peter Thompson—Schweitzer–Mauduit International—CFO*—As we disclosed in material today, we have relationships with two customers where there's licenses that are in place for LIP

technology, and then there's a portion of the market that's being supplied with imported paper that there's no license in place, and that's where the infringement is occurring that we have the litigation occurring.

What we will do is evaluate any other products that come toward as to whether or not they infringe. Obviously if it's sold through a license, then we've agreed to it whether we participate directly or not. So it really comes down to if a product is being used by any customer or supplied by any competitor that causes a cigarette to go out and meet an LIP standard, we then have to evaluate it and determine whether or not we feel it fringes on our patent and then take action. Now, it could be with a customer who has an existing agreement for us for a product like MUSA using an alternative product. If they're using a product that's licensed by us—and there's two cases, then all is fine. If they're using a product that's not licensed by us, we'll evaluate whether or not it's a problem and take appropriate action. In no case would we have an alternative product being used by a customer that is for an LILP application where at this point we would say it's okay. *In other words we are evaluating any other LIP products to determine whether or not they infringe.*

*Jim Rice—GWI Asset Management—Analyst*—So the Phillip [sic] Morris purchase, that they've agreed to, is that under license or not?

*Peter Thompson—Schweitzer–Mauduit International—CFO*—With Phillip [sic] Morris, to be clear there's one product supplied under contract, which is an LIP product, the banded online product, we codeveloped with them, and that's the extent of our relationship with PM USA for LIP products. So any-

thing else isn't under that agreement, and that's the only agreement we have with PM USA.

*Jim Rice—GWI Asset Management—Analyst*—Okay. Do you anticipate also bringing action against Phillip [sic] Morris?

*Peter Thompson—Schweitzer–Mauduit International—CFO*—Well, as we said we're not going to make that decision until we would evaluate the facts of any other alternative products that they're using or being supplied not only to Phillip [sic] Morris, but to any consumer. So it's fact-dependent. It requires us to do an evaluation of the physical product against our patent and then we make that determination.

\* \* \*

*Thomas Russo—Gardner Russo—Analyst*—Thank you. And then are there legitimate alternative technologies for applying off-line banding that would be permitted with—going into the market without violating your IP?

*Peter Thompson—Schweitzer–Mauduit International—CFO*—Well, we couldn't categorically say that. We would say right now is that of the product in trust that we're not supplying either direct or through licenses or code-veloped with Phillip [sic] Morris is where we're filing suit.

*Thomas Russo—Gardner Russo—Analyst*—And over time, as Spotswood increasingly lose [sic] the volume and the online product that comes has to absorb the whole burden of the operation, what will happen to the price differences between the offline and online branded products and Phillip [sic] Morris will ultimately have to choose the sourcing?

*Peter Thompson—Schweitzer–Mauduit International—CFO*—The online product will continue to rise in cost and, therefore, price as the volume declines.

*Thomas Russo—Gardner Russo—Analyst*—And what would that price spread be for the moment justice by contrast?

*Peter Thompson—Schweitzer–Mauduit International—CFO*—Today it's pretty similar.

Plaintiffs attempt to tie some of the statements quoted above to one of the three general subjects about which they claim Defendants misled the market. For example, the fourth-quarter 2009 form 8–K is alleged to reveal "the truth regarding the competitive pressures Schweitzer was facing," and Plaintiffs allege that Defendants "continued to reveal the truth regarding the nature of Schweitzer's relationship with [PMUSA]" on the February 11 conference call. Plaintiffs do not, however, endeavor to explain which portions of the quoted statements correct particular previously quoted misstatements and omissions.

**F. Defendants' Post–Class Period Revelations**

Finally, Plaintiffs quote two post-class-period statements released by Schweitzer. First, they cite the following language from a February 12, 2010 press release:

Schweitzer–Mauduit International, Inc.'s contract with Philip Morris USA, Inc. (Philip Morris USA) specifies that Schweitzer–Mauduit will serve as the sole supplier of the co-developed, on-line banded cigarette paper technology (MOD) used to produce low ignition propensity (LIP) cigarettes. Schweitzer–Mauduit is, and has been for many years, a strategic partner with Philip Morris USA. Philip Morris USA is able to develop or explore alternatives to their MOD technology for their LIP needs and has informed us of their intent to do so on a volume of their requirements that is not material to

SWM's ongoing supply of MOD product. The existing agreement does not address either party's rights to any technology beyond MOD.

Mr. Villoutreix, commented, "Our comprehensive patent portfolio along with a commercially proven product has enabled Schweitzer–Mauduit to become the premier provider of LIP technologies for our industry. We have, and will continue, to protect our intellectual property and strive to further improve our LIP tech-nologies and solutions to sustain this leadership position.

(¶ 86). Second, Plaintiffs quote the following excerpt from Schweitzer's second-quarter 2010 Form 10–Q, which was filed on August 4, 2010:

> The Company has been advised by Philip Morris–USA that it disputes the manner in which the Company has calculated costs for banded cigarette papers under a cost-plus based contract for this product. Currently, the disputed amount is approximately $15.8 million. While the Company believes that it has properly calculated the amount it invoiced, the ultimate resolution of this dispute, if unfavorable to the Company, could have a material adverse effect on the Company's results of operations.

## II. Discussion and Analysis

### A. Legal Standard on a Motion to Dismiss

■ A complaint must be dismissed if, accepting all well pleaded factual allegations as true and construing all reasonable inferences therefrom in the light most favorable to the plaintiff, it fails to state a claim upon which relief can be granted. FED.R.CIV.P. 12(b)(6); *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir.2006). In order for a complaint to survive a motion to dismiss, it must include "factual allegations adequate to raise a right to relief above the speculative level," with "enough heft to set forth a plausible entitlement to relief." *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1282 (11th Cir.2007) (internal punctuation and quotations omitted) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Garfield*, 466 F.3d at 1261. "Regardless of the alleged facts, however, a court may dismiss a complaint on dispositive issues of law." *In re Sportsline.com Sec. Litig.*, 366 F.Supp.2d 1159, 1162 (S.D.Fla.2004) (citing *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir.1993)). Moreover, "a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 554, 127 S.Ct. 1955.

In addition to the foregoing requirements applicable to motions to dismiss generally, securities fraud complaints are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), which are discussed more fully below. Finally, the Court may take judicial notice of the contents of relevant public documents filed with the Securities and Exchange Commission ("SEC") and may also consider undisputedly authentic evidence outside the pleadings on which the plaintiffs rely in their complaint. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1280 (11th Cir.1999); *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n. 2 (11th Cir.1999).

### B. Section 10(b) Claim

■ Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder make it unlawful for any individual to employ a manipulative or deceptive device in

connection with the purchase or sale of any security. 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5. To state a claim of securities fraud under these provisions, a plaintiff must allege "(1) a false statement or omission of material fact (2) made with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's injury." *Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir.1997). Defendants have moved to dismiss Plaintiffs' amended complaint, arguing that Plaintiffs have failed to adequately plead a material misstatement or omission of existing fact, a "strong inference" of scienter as required under the PSLRA and *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007), and loss causation.

### 1. Plaintiffs Have Failed to Sufficiently Plead a False Statement or Omission of Material Fact.

■ Fed.R.Civ.P. 9(b) requires that all claims of fraud, including federal securities fraud claims, be pleaded with particularity. That rule is satisfied where a complaint "sets forth precisely what statements or omissions were made in what documents or oral representations, who made the statements, the time and place of the statements, the content of the statements and manner in which they misled the plaintiff, and what benefit the defendant gained as a consequence of the fraud." *In re Theragenics Corp. Sec. Litig.*, 105 F.Supp.2d 1342, 1347 (N.D.Ga.2000). Moreover, the PSLRA provides that a securities fraud class action complaint

> shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1)(B).

■ Defendants assert that Plaintiffs' amended complaint does not satisfy the PSLRA's heightened pleading requirements because "it (1) fails to specify each statement alleged to be false or misleading, (2) fails to explain the reason why the statement was false or misleading, and (3) fails to allege all facts on which this belief of falsity is based." The Court agrees.

The amended complaint spans eighty-five pages and contains 133 paragraphs. As shown above, the allegedly false and misleading statements are presented in a series of lengthy block quotes from conference calls, press releases and SEC filings. Some portions of the statements are bolded and italicized, but Plaintiffs fail to explain the significance of the emphasized language as compared to the remainder of the quoted material. It cannot seriously be alleged that every word of the quoted statements is materially false or misleading, but in light of the fact that some of the paragraphs do not contain any emphasized language, neither can it be said that Plaintiffs' allegations of material misstatements are confined only to those statements that are emphasized. After numerous paragraphs with long block quotes from a variety of sources, Plaintiffs offer a conclusory list of deficiencies and omissions that does not explain why any particular statement is false or misleading. As another district court has explained, such pleading attempts are insufficient:

> The Complaint as it now stands is a rambling set of allegations which is almost impossible to effectively review. Although it is shorter than some securities fraud complaints the court has seen, it is still far longer than necessary and it is confusingly arranged. Plaintiff sets forth lengthy quotes from various re-

leases by defendants' officers and a securities analyst but does not make clear what portion of each quote constitutes a false representation. Plaintiff then proceeds to make further conclusionary statements about what defendants represented followed by allegations, some general and some specific, in an attempt to show why the representations were false. These allegations do not clearly show why the quoted representations were false when made. Plaintiff has failed to point to particular contemporaneous, inconsistent statements by defendants or show that specific information available to defendants revealed something different than what defendants were stating.

*Shuster v. Symmetricom, Inc.*, No. C 94–20024 RMW (PVT), 1997 WL 820967, at *1 (N.D.Cal. June 25, 1997) (internal emphasis and punctuation omitted).

Plaintiffs' pleading failures are well illustrated by paragraph 60, which is over two pages long and contains seven statements that are alleged to be false and misleading. Plaintiffs cannot possibly contend that every statement in that paragraph is false and misleading. For example, the second statement quoted in paragraph 60 reads as follows:

> International LIP efforts continue, especially in the European Union, or EU. Australia will implement LIP regulations effective in March 2010 and Finland will follow with implementation in April 2010. The compliance test standards for Australia and Finland are consistent with test standards in Canada and the United States. In July 2009, SWM announced that the British American Tobacco affiliate in Australia, which has an approximately 60 percent share of that market, will exclusively use SWM's Alginex® banded papers.

Plaintiffs present no argument that anything in this statement is untrue, but the statement is nevertheless included in the section entitled "Defendants' false and misleading class period statements." Although portions of six of the seven statements contained in paragraph 60 are bolded and italicized, Plaintiffs do not appear to allege that even the emphasized language is false or misleading in its entirety. For example, the fifth statement in the paragraph reads:

> The U.S. segment's operating profit was $12.5 million in the three months ended June 30, 2009, an $8.6 million increase from $3.9 million in the prior-year quarter. Higher selling prices and changes in the mix of products sold increased operating profit by $10.4 million, ***primarily due to higher sales of cigarette paper for LIP cigarettes.***

However, Plaintiffs never allege that Schweitzer's second-quarter 2009 profit did not increase, nor do they allege that the increase was due to a factor other than higher sales of LIP cigarette paper. Indeed, the only explanation given as to why the statements in paragraphs 59 through 63 are false are given in very general and vague terms that wholly fail to address any specific false or misleading statement:

> For the reasons stated in the Substantive Allegations above, and as further detailed herein, the statements in ¶¶ 59–63 above, which touted among other things, Defendants' confidence in Schweitzer's intellectual property, were materially false and misleading when made or omitted to make such statements not false and misleading because: (a) Schweitzer's relationship with PMU-SA—its largest customer—was threatened by contractual disputes that could have a material adverse effect on the Company's results of operations; (b) PMUSA had begun to seek out competi-

tors to source its paper needs; (c) Schweitzer's competitive position was not adequately protected from foreign competition as to LIP paper and such competitors were increasingly developing alternative methods to develop LIP paper; (d) Schweitzer's competitive position was much more precarious than represented by Defendants; (e) efforts by competitors to invade Schweitzer's market share were growing; and (f) for the reasons detailed herein, the SOX certifications signed by Defendants and incorporated in the Company's Forms 10–Q were false.

"Plaintiffs failure to address defendants allegedly misleading statements individually, or even by category, and to state why each statement, or category of statements is misleading, renders this Courts task, and the task of the defendants, excessively difficult." *May v. Borick*, No. CV 95–8407 LGB (EX), 1997 WL 314166, at *8 (C.D.Cal. Mar. 3, 1997).

The foregoing examples of Plaintiffs' pleading failures are far from isolated. Paragraphs 67 through 73 likewise contain long block quotes with unexplained emphases and are identified as being false and misleading in a single paragraph identical to paragraph 66 quoted above.

Throughout their amended complaint, Plaintiffs have compiled a series of statements—almost all of which contain multiple passages presented in the form of lengthy block quotes—and then paired each series of statements to the same conclusory list of deficiencies. This is a classic example of "puzzle pleading," which, as another district court explained, is unacceptable:

Although Plaintiffs' 250–paragraph, 102–page Amended Complaint is long, it states very little with particularity. Plaintiffs list various statements—often setting forth lengthy quotations from various releases by Defendants' officers and securities analysts—then follow each with a similar (in most cases identical) laundry list of "specific" reasons why the statements are allegedly false. Plaintiffs neglect to make it clear what portion of each quotation constitutes a false representation, or which statements link up with which issues in the laundry list, placing the burden on the Court to sort out the alleged misrepresentations and then match them with the corresponding adverse facts. This method is deficient under the [PSLRA's] pleading standards.

*In re Alcatel Secs. Lit.*, 382 F.Supp.2d 513, 534–35 (S.D.N.Y.2005) (internal citations to the record omitted).

As explained above, the PSLRA requires that Plaintiffs "specify *each statement* alleged to have been misleading" and "the reason or reasons why the statement is misleading[.]" 15 U.S.C. § 78u–4(b)(1) (emphasis added). Plaintiffs cannot satisfy this requirement by transcribing every statement made or issued by Schweitzer on particular topics and then alleging in general terms that the true facts that can be gathered from the rest of the complaint show those statements to be misleading. The facts supporting each allegation of falsity are completely separate from each misstatement, as are the allegations of scienter, and the hapless reader of the complaint is left to sort out the allegations and the allegedly adverse facts. "We remind plaintiffs that the heightened pleading rules are designed to elicit clarity, not volume. The court should not have to play connect-the-dots in order to identify the facts and trends upon which plaintiffs base their claim." *In re PETsMART, Inc. Sec. Litig.*, 61 F.Supp.2d 982, 991 (D.Ariz.1999).

For these reasons, Plaintiffs' amended complaint must be dismissed for failure to plead a material misstatement or omission

with sufficient particularity. However, the Court will grant Plaintiffs leave to file a second amended complaint that cures the deficiencies described herein.[8]

### 2. Plaintiffs Have Failed to Sufficiently Plead Scienter.

#### a. Legal Standard

■ The PSLRA mandates that a plaintiff asserting a securities fraud claim "shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The required state of mind for a § 10(b) claim is "scienter," which is defined as an intent to deceive, manipulate or defraud, or a showing of severe recklessness. *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir.2008); *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976). Therefore, in a securities fraud class action, a plaintiff can no longer plead the requisite scienter element generally, as he previously could under Fed.R.Civ.P. 9(b). *Mizzaro*, 544 F.3d at 1238. Rather, "[t]he PSLRA demands specific, particularized pleading." *In re NDCHealth Corp., Inc. Sec. Litig.*, No. 1:04–cv–970–WSD, 2005 WL 6074918, at *7 (N.D.Ga.2005) (further noting that conclusory allegations are insufficient and that a securities fraud complaint "must provide a factual basis for allegations of scienter").

In *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499, the Supreme Court elaborated on the PSLRA's exacting pleading requirements, explaining that "[t]o qualify as 'strong' ... an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." The Court continued:

> To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must consider plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the "smoking-gun" genre, or even the most plausible of competing inferences.... Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Id.* at 323–24, 127 S.Ct. 2499 (internal quotations and citations omitted). Thus, "the court must review all the allegations holistically" to determine whether scienter is sufficiently alleged. *Matrixx Initiatives, Inc. v. Siracusano*, ─── U.S. ───, 131 S.Ct. 1309, 1324, 179 L.Ed.2d 398 (2011) (quoting *Tellabs*, 551 U.S. at 326, 127 S.Ct. 2499). However, although factual allegations may be aggregated to infer scienter, the complaint must allege facts supporting a strong inference of scienter "for each

---

8. Plaintiffs' pleading failures prevent the Court from effectively addressing Defendants' argument that the PSLRA's statutory safe harbor for forward-looking statements, 15 U.S.C. § 78u–5(c)(1), is applicable. Until Plaintiffs make clear what statements are challenged, the Court cannot analyze whether those statements are forward-looking such that they might qualify for protection under the safe harbor. Because Plaintiffs have otherwise failed to plead a false statement or omission of material fact, however, the Court need not address the merits of the safe-harbor defense at this time. *See In re Spectrum Brands, Inc. Sec. Litig.*, 461 F.Supp.2d 1297, 1320 n. 9 (N.D.Ga.2006).

defendant with respect to each violation." *Phillips v. Scientific–Atlanta, Inc.,* 374 F.3d 1015, 1016 (11th Cir.2004).[9]

### b. Analysis

■ Defendants argue that Plaintiffs' amended complaint fails to give rise to the requisite strong inference of scienter. Plaintiffs disagree, arguing that their "well-pled allegations demonstrate several indicia of Defendants' scienter...." Among other things, Plaintiffs contend that scienter can be inferred because Defendants' alleged misrepresentations and omissions concerned matters that are integral to the Company's core operations, because the Individual Defendants signed Sarbanes–Oxley certifications of Schweitzer's financial statements, and because the Company made a stock offering and Defendant Thompson made unusual and suspicious stock sales during the class period. The Court disagrees.

Assuming that Plaintiffs are correct in their assertion that the alleged misstatements and omissions are "integral to the Company's core operations," they have failed to allege specific facts showing that Defendants had knowledge of, or were severely reckless with regard to, the falsity of their statements at the time they were made. Neither do Plaintiffs' allegations show the kinds of red flags that other courts have relied on when inferring scienter.

For example, in *Epstein v. Itron, Inc.,* 993 F.Supp. 1314, 1325–26 (E.D.Wash. 1998), the plaintiff alleged that the defendant company's primary product was "technologically incapable of meeting requirements that are central to [the company's] continued survival as a business entity." By contrast, Plaintiffs in this case do not allege that Schweitzer's LIP products were in any way deficient, but only that one of Schweitzer's largest customers was considering obtaining some of its LIP paper from other sources and that Schweitzer was facing growing competition in Europe. Absent more particular allegations about Defendants' knowledge or more compelling red flags, inferring scienter in this case "would contravene the express directives of the PSLRA requiring Plaintiff[s] to allege facts sufficient to meet [their] pleading burden." *In re NDCHealth Corp.,* 2005 WL 6074918, at *8 n. 10.

Plaintiffs' allegations concerning the Individual Defendants' SOX certifications of Schweitzer's financial statements are also insufficient to support a strong inference of scienter. In *Mizzaro,* the Eleventh Circuit summarized when such certifications are relevant to the scienter inquiry:

> In *Garfield,* we held that "a Sarbanes–Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements." 466 F.3d at 1266. A certifier would be severely reckless, *Garfield* held, only if he "had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other red flags, that the financial statements contained material misstatements or omissions." Because no such glaring "accounting irregularities" or "red flags" are present here, the Sarbanes–Oxley certifications by the individual defendants do not support an inference of scienter.

544 F.3d at 1252 (internal punctuation omitted). Absent specific factual allega-

---

9. With respect to a corporate defendant, the Eleventh Circuit has observed that "[c]orporations, of course, have no state of mind of their own. Instead, the scienter of their agents must be imputed to them." *Mizzaro,* 544 F.3d at 1254.

tions that the Individual Defendants knew or should have known that Schweitzer's financial reports were materially false and misleading when issued, or allegations that they ignored any reasonably available data that would have indicated such falsity, "Plaintiffs cannot impute such knowledge to the Individual Defendants merely because they certified the financial statements." *In re Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F.Supp.2d 873, 896 (N.D.Ohio 2006). This is especially true where, as here, Defendant did not restate its financial statements, because "[a]lthough a restatement is not an admission of wrongdoing, the mere fact that financial results were restated is sufficient basis for pleading that those statements were false when made." *In re Atlas Worldwide Holdings, Inc. Sec. Litig.*, 324 F.Supp.2d 474, 486 (S.D.N.Y.2004). Plaintiffs have made no such factual allegations, and the SOX certifications signed by the Individual Defendants are therefore not probative on the question of scienter. *Mizzaro*, 544 F.3d at 1252.

Plaintiffs fare no better in their attempt to demonstrate scienter by reference to stock sales by Defendant Thompson during the class period. "For individual defendants' stock sales to raise an inference of scienter, plaintiffs must provide a 'meaningful trading history' for purposes of comparison to the stock sales within the class period." *Zucco Partners*, 552 F.3d at 1005. The fact that an insider's sale of stock holdings is "substantial" does not, standing alone, compel the conclusion that such a sale is also unusual or suspicious. *Waterford Twp. Gen. Emps. Retirement Sys. v. CompuCredit Corp.*, No. 1:08–cv–2270–TWT, 2009 WL 4730315, at *8 (N.D.Ga. Dec. 4, 2009). Plaintiffs offer no information whatsoever regarding Defendant Thompson's trading history, and there is therefore no context from which to determine whether his Class–Period sales

were unusual or suspicious. *In re NDCHealth Corp.*, 2005 WL 6074918, at *10.

Additionally, Plaintiffs point to no stock sales by Defendant Villoutreix, a fact that further undermines their attempt to infer scienter from Defendant Thompson's sales. As the Ninth Circuit explained, the inference of scienter to be drawn from one insider's trading is weakened where "the rest of the equally knowledgeable insiders act in a way inconsistent with the inference that the favorable characterizations of the company's affairs were known to be false when made." *Ronconi v. Larkin*, 253 F.3d 423, 436 (9th Cir.2001).

Nor do the statements of the four confidential witnesses on which Plaintiffs rely in their amended complaint help Plaintiffs establish a strong inference of scienter. As an initial matter, most of the statements of the confidential witnesses are not probative of scienter at all, but are instead in the nature of general background information about, inter alia, the history and development of Schweitzer's LIP products and the United States' share of the global cigarette market. To establish an inference of scienter, Plaintiffs must allege what Defendants supposedly knew about Schweitzer's patent portfolio, the Company's competitors, and PMUSA's intentions regarding future LIP purchases.

The only information Plaintiffs offer that is potentially relevant to the scienter inquiry is the statement of a confidential witness—a former lab tester—that "in 2009 and possibly earlier, there was talk among [Schweitzer] employees that PMUSA's contract with Schweitzer was coming to end" and that PMUSA was investigating possible other sources for its LIP paper. The Eleventh Circuit has held, however, that reliance on confidential witnesses is permissible only "so long as the complaint

unambiguously provides in a cognizable and detailed way the basis of the whistleblower's knowledge." *Mizzaro*, 544 F.3d at 1239. In other words, the Court must be able to determine whether the former lab tester has reliable first-hand knowledge or whether his statements are based on unreliable hearsay or gossip. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir.2009). Throughout the former lab tester's employment at Schweitzer, his job duties included, among other things, quality-assurance testing and ensuring product compliance with Company and customer specifications. There is no basis to conclude that the lab tester's opinions about the cost of the MOD technology, the nature of the relationship between PMUSA and Schweitzer, and whether PMUSA paid the salaries of some Schweitzer employees are based on anything but speculation or hearsay. Indeed, paragraph 50 of the amended complaint indicates that the lab tester "was not privy to the specifics of the" contract between PMUSA and Schweitzer and that some of his statements are based on nothing more than "talk among [Schweitzer] employees," "talk around the mill," and vague beliefs and impressions about the relationship between Schweitzer and PMUSA. Accordingly, in light of Plaintiffs' failure to plead sufficient facts to demonstrate the basis for the former lab tester's statements, those statements do not support an inference of scienter.

Having reviewed the entirety of Plaintiffs' amended complaint in light of the strict pleading standards that apply to this type of action, the Court concludes that Plaintiffs' allegations do not give rise to the strong inference of scienter required by the PSLRA and *Tellabs*.

### 3. Plaintiffs Have Sufficiently Pled Loss Causation

■■■■■■ Under the PSLRA, a plaintiff has the burden of proving that the act or omission of the defendant proximately caused the plaintiff's injury. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 340, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005). Loss causation refers to the link between the defendant's misconduct and the plaintiff's economic loss, and it requires a plaintiff to show that "the untruth was in some reasonably direct, or proximate, way responsible for his loss." *In re Coca–Cola Enters., Inc. Sec. Litig.*, 510 F.Supp.2d 1187, 1203 (N.D.Ga.2007). In essence, this element requires that Plaintiffs allege that the share price of the security at issue "fell significantly after the truth became known," *Dura Pharm.*, 544 U.S. at 347, 125 S.Ct. 1627, or that Defendants' misstatements or omissions concealed a foreseeable risk that ultimately materialized, *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 175 (2d Cir.2005). "Loss causation does not require a showing that the alleged misstatements were the sole cause of loss; however, Plaintiffs must allege adequately that the material misstatements or omissions were a significant contributing cause to the loss." *In re Immucor Inc. Sec. Litig.*, No. 1:05–cv–2276–WSD, 2006 WL 3000133, at *19 (N.D.Ga. Oct. 4, 2006).

■■■■ Unlike a pleading of scienter, allegations of loss causation in a securities fraud case are not subject to heightened pleading standards and need only satisfy Fed.R.Civ.P. 8(a)(2). *See Dura Pharm.*, 544 U.S. at 346, 125 S.Ct. 1627; *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 267 (5th Cir.2009) ("[U]nder Rules 8(a)(2) and 12(b)(6), at the pleading stage, the plaintiff is only required to plead a plausible cause of action; we are not authorized or required to determine whether the plaintiff's plausible inference of loss causation is equally or more plausible than other competing inferences, as we must in assessing allegations of scienter under the PSLRA."). The Court finds that Plaintiffs

have satisfied this standard and have adequately pled loss causation.

In *Immucor*, the plaintiffs alleged that the defendant company and two of its officers made a series of misleading statements and omissions that understated the seriousness of corruption problems within an Italian subsidiary of the company and artificially inflated the company's stock price. The plaintiffs further claimed that an announcement of a formal SEC investigation revealed the truth concerning the scope and gravity of the corruption and caused a seventeen-percent drop in the company's stock price. The defendants moved to dismiss, arguing that the plaintiffs failed to adequately plead loss causation. Specifically, the defendants argued that announcement of the SEC investigation did not amount to a disclosure of the truth to the market and that such corrective disclosure did not occur until months later. The court denied the motion to dismiss:

> Because allegations of loss causation should be evaluated under the notice pleading standard [of] Rule 8 of the Federal Rules, the Court finds that Plaintiffs have pled loss causation adequately. Plaintiffs' Amended Complaint gives Defendants notice of both the loss alleged—a 17% drop in Immucor stock prices—and the causal nexus—the 17% drop followed closely after an announcement of a formal SEC investigation, alleged by Plaintiffs to be the disclosure of the relevant truth to the market. Even though loss causation may be difficult for Plaintiffs to prove, the Court finds the Amended Complaint provides Defendants with sufficient notice of Plaintiffs['] claims to meet the minimal pleading standard of Federal Rule of Civil Procedure 8.

2006 WL 3000133, at *20.

Similarly, Plaintiffs in this case allege that Defendants' statements and omissions understated the magnitude of some problems (such as the cost-plus agreement dispute with PMUSA) and concealed others (such as competitive threats and the weakness of Schweitzer's intellectual property portfolio). Plaintiffs allege that Defendants' statements on February 10 and 11, 2010 amounted to corrective disclosures that revealed the truth about these issues, and they also allege that after the truth was revealed Schweitzer's stock fell approximately thirty-four-percent.

Defendants claim that the February 10 and 11 statements did not reveal or correct any prior misstatements or omissions, just as the defendants in *Immucor* argued that the revelation of the SEC investigation "did not amount to a disclosure of the 'true truth' to the market." *Id.* For the same reasons that the court in *Immucor* found that the plaintiffs there had satisfied the pleading standards applicable to allegations of loss causation, the Court finds that the Plaintiffs here have satisfied those pleading standards. However, Plaintiffs' failure to sufficiently plead a misstatement or omission of material fact and scienter nevertheless requires dismissal of their claims under § 10(b) and Rule 10b–5.

## C. Section 20(a) Claim

■ Section 20(a) of the Exchange Act provides that "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall . . . be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). This statute "imposes derivative liability on persons that control primary violations of the Act." *Laperriere v. Vesta Ins. Group, Inc.*, 526 F.3d 715, 721 (11th Cir.2008). A primary violation of the securities laws is an essential element of a § 20(a) claim for

derivative liability. *Rosenberg v. Gould,* 554 F.3d 962, 967 (11th Cir.2009). Therefore, "[b]ecause the complaint fails to allege primary liability under section 10(b), there can be no secondary liability under section 20(a)." *Id.*

### III. Conclusion

For the foregoing reasons, Defendants' motion to dismiss [39] is GRANTED without prejudice. Plaintiffs are granted leave to file, on or before September 23, 2011, a second amended complaint that cures the deficiencies discussed above.